**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

_____
**ROBERT L. NICHOLS**        )
                               )
       **Plaintiff,**        )
                               )
       **v.**                )       **Civil Action No. WGC-07-3389**
                               )
**LOUIS P. STONE, III,** *et al.*   )
                               )
       **Defendants.**     )
_____)

## MEMORANDUM OPINION

This is a derivative action brought by the Plaintiff, Robert Nichols, ("Nichols") on behalf of the partnership and holders of limited partnership interests in PAR Limited Partnership ("PAR") against Broomes Island Yacht Club, Inc, ("BIYC"), General Partner of PAR, Louis P. Stone, III ("Stone"), Jeannie Stone[1] and Stoney's Seafood House, Inc. ("Stoney's") (collectively, "Defendants"). The Plaintiff has pled claims for 1) Breach of Contract; 2) Unjust Enrichment; 3) Tortious Interference with Contractual Relations; 4) Tortious Interference with Prospective Advantage; 5) Breach of Fiduciary Duty; 6) Intentional Misrepresentation; 7) Constructive Fraud; 8) Fraudulent Concealment; and 9) seeks injunctive relief to remove Stone from control of PAR business and a court-supervised impartial examination of the business records of the partnership.

Plaintiff is a resident and citizen of the Commonwealth of Virginia and all Defendants are residents and citizens of the State of Maryland. All actions and conduct concerning Plaintiff's causes of action occurred in the State of Maryland. The court's jurisdiction is based on the diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332. The substantive laws of the

---

[1] Jeannie Stone was dismissed as a defendant by the Court at the conclusion of all the evidence on August 28, 2010.

forum state (Maryland) apply.  The case was filed on December 19, 2007.

Evidence was taken during a four day bench trial held on August 24, 25, 27 and 28, 2009. At the conclusion of the presentation of evidence on August 28, 2009, the matter was taken under advisement and the court requested the parties to submit recommended findings of fact and conclusions of law.  The plaintiff filed his recommended findings of fact and conclusions of law on September 17, 2009 and the defendants filed comparable papers on September 22, 2009.

## **Findings of Fact**

1. The plaintiff, Robert Nichols, has been employed in a part time capacity for the past six years as a settlement agent with Lighthouse Title.  Nicholas studied real estate appraisal and has actively managed real estate.  For 35 years he was involved in the marketing aspects of mortgage banking.  He previously owned several real estate investment properties.

2. In 1986 Nichols acquired Broomes Island property for $742,000.  Nichols spent approximately $250,000 in upgrading the property by improving the septic system, drainage fields, baths and kitchens.  After the improvements to the property Nichols testified that he recognized approximately $40,000 to $45,000 cash flow per year.  Nichols does not have financial or tax records or copies of rental agreements, at this time, to substantiate his claimed income.  From 1988 to 1994 Nichols was a weekend visitor to Broomes Island.

3. The Broomes Island property was operated as a marina containing boat slips, a restaurant and approximately ten rental residential structures.  In the early 1990s Nicholas improved the marina by removing certain old piers, repairing other piers, dredging and constructing new piers that contained electricity, lighting and water.  The marina contained 51 slips of which 35 were rented out and 16 were transient.  Nichols received approximately $25,000 to $29,000 in 1993 and 1994 from slip rentals and approximately $45,000 to $49,000 in 1993 and 1994 from rentals

of the residential structures.  This cash income was realized before Nichols met his debt service obligations.

4.      In the latter part of 1988 Nichols met Stone who expressed an interest in operating the restaurant.  At that time the restaurant was in need of significant improvement.  Nichols was receiving $1,000 a month from the rental of the restaurant.  In 1988 Nichols and Stone entered into a verbal agreement whereby Stone paid Nichols $1,000 a month for the rental of the restaurant and agreed to maintain and upgrade the restaurant.  Nichols testified that Stone increased the size of the restaurant and "did a nice job" in upgrading the restaurant. Stone testified that prior to 1995 he had invested approximately $280,000 in improving the restaurant and related assets.  In order to provide for additional parking as required by Calvert County, Nichols allowed twenty of the rental slips to be temporarily converted to transient slips for use by restaurant patrons.  All of the trailers and a little cottage were removed to provide for additional restaurant parking.  The apartments on the property were frequently occupied by employees of Stoney's.  All of the rental properties that were on Broomes Island in 1997 are still present.

5.      From 1988 through 1995 Nichols and Stone operated under the verbal arrangement outlined in the above paragraph.  On January 9, 1994 Nichols wrote to Stone about renting more of the marina property.  In this letter, Nichols wrote: "As you know we are not trying to squeeze the final nickel out of the property.  I [Nichols] wanted you [Stone] to recover over time, the capital improvements you have made and/or will make in the future."  The parties altered their business arrangement in 1995.  On June 28, 1995  Nichols, T/A Broomes Island Marina, and Stoney's Seafood House, T/A Stoney's Seafood, entered into a two year written lease lasting from January 1, 1995 to December 31, 1996 for the rental of Stoney's Restaurant, two

apartments, the former marina office, a house and eight slips all located on Oyster House Road. The annual rent was $60,000 to be paid in equal monthly installments.   There was no rent escalation clause.   Stoney's was also responsible for the payment of all fuel, telephone, electricity, water and sewer used on the premises.   Stone testified that all of these expenses were paid by Stoney's. The lease was personally guaranteed by Stone.   The lease was drafted by Nichols' attorney.   There were portions (slips and residential buildings) of the Broomes Island Marina that were not covered by this lease.

6.      On the same day the written lease described in the above paragraph was entered into, Nichols and Stone signed a Letter of Intent.   The letter provided that a Maryland general partnership was to be formed to acquire, develop and manage the property known as the Broomes Island Marina.   Nichols and Stone were to be the general partners.   The marina property was to be conveyed to the partnership upon the payment of $750,000 from Stone to Nichols.   Stone was to be the managing partner.   All existing leases on the property would convey to the new partnership.   Stone would be permitted to defer the $5,000 monthly rental payment for a period of two years.   One half of the deferred $5,000 monthly rental payment would be considered a capital contribution by Nichols.   Settlement was to occur within 30 days of full ratification of the letter of intent, or within an unspecified number of days of full ratification of a partnership agreement, whichever is later, otherwise the transaction would be abandoned.   By the terms of the letter of intent, the letter was not a binding contract.

7.      On November 30, 1995 a contract and limited partnership agreement was entered into among Nichols, Stone and Broomes Island Yacht Club, Inc.   The contract provided that a Maryland limited partnership was to be formed to acquire, manage and develop Broomes Island Marina.   BIYC was to be the general partner and Nichols and Stone were to be limited partners.

The Broomes Island Marina property was to be conveyed free of debt to the partnership upon payment of $750,000 by Stone to Nichols.  All leases would be transferred to the partnership and Stone was permitted to defer the $5,000 monthly rental payment for Stoney's Restaurant to the partnership for a period of two years.  One half of that amount would be considered a capital contribution by Nichols.  The parties contemplated expansion of activities on the property to include, among other things, an additional restaurant.  In the event of any conflict between the contract terms and the partnership agreement, the terms of the contract would govern.  Settlement was to occur within 15 days of full ratification of the contract or within 15 days of full ratification of the partnership agreement, whichever occurred later, otherwise the transaction would be abandoned.

8.      The limited partnership agreement executed contemporaneously with the contract created "P A R[2] Limited Partnership" and provided that BIYC would be the general partner and Nichols and Stone would be limited partners.  BIYC had a 1% partnership interest and Nichols and Stone each owned a 49.5% partnership interest.  According to the agreement, Nichols and Stone each initially contributed $750,000 to the partnership. The P A R Limited Partnership has a 30 year term, until December 31, 2025.  According to Section 10 of the limited partnership agreement, the management and control of PAR business lies solely with the general partner, BIYC, and the general partner is obligated to operate the partnership for the benefit of all the partners.  Pursuant to Section 10.25 of the limited partnership agreement, BIYC's authority includes insuring PAR assets and undertakings against any and all risks.

9.      An organizational meeting and an initial meeting of the stockholders of BIYC were held on November 30, 1995.  Nichols and Stone were elected directors.  Stone was elected President and Nichols was elected Secretary/Treasurer.  Pursuant to the By-Laws of BIYC, Stone as

---

[2] "**P**hilip **A**nd **R**obert."  Philip is Stone's' middle name.

President was the principal executive officer of the corporation and had general supervision and control of all the business and affairs of the corporation.  As Secretary/Treasurer, Nichols had responsibility for the charge and custody of all funds and securities of the corporation. The By-Laws provided for an annual meeting every September 1st at 2:00 p.m. beginning on September 1, 1996.  Stone was issued 51 shares of stock and Nichols 49 shares of stock .  This action gave Stone control of BIYC and in turn control of PAR.  Since 1995 there have been no meetings of the directors or stockholders of either BIYC or PAR nor any elections held.

10.     Stone has multiple responsibilities.  Specifically, Stone is a tenant of PAR (as owner of Stoney's), a limited partner of PAR, and the managing member of BIYC, the general partner of PAR.  Nichols consented to this arrangement.

11.     On December 20, 1995 a settlement occurred where Nichols conveyed the Broomes Island property to PAR.  The Settlement Statement (HUD-1) reflected a contract sales price of $1,030,055.  A $750,000 loan funded by Maryland Bank and Trust Company and secured by a deed of trust was placed on the property.  The borrower on the $750,000 loan was PAR Limited Partnership.  There were four commercial guarantees executed to further secure the loan.  The loan was guaranteed by Robert L. Nichols, Margo J. Nichols (Nichols' wife), Louis P. Stone, and Broomes Island Yacht Club, Inc.  Two mortgages totaling $428,930.42 and owed by Nichols were satisfied.  Nichols was also credited with a partnership contribution of $280,055 (which includes an adjustment for settlement costs).  Nichols also received $295,828.80 in cash and paid $30,981.58 in settlement charges.  Nichols raised objections to the numbers contained on the settlement statement as they did not comport with the terms of the November 30, 1995 contract between Nichols, Stone and BIYC.  Nichols' objections were not resolved.  The settlement on December 20, 1995 did not timely occur as required by the November 30, 1995 contract.  It was

reported to the Internal Revenue Service that Nichols had a capital gain on the sale of the Broomes Island Property consistent with a sales price of $1,030,055 not $1,500,000.

12.    The transaction on December 20, 1995 did not conform to the terms of the P A R Limited Partnership Agreement and the agreement was never modified to reflect the transaction.

13.    The CPA firm of Mullen, Sondberg, Wimbish & Stone, P.A. prepared statements of assets, liabilities and partners' capital - income tax basis of PAR as of December 31, 1996 and 1997. These statements were dated July 18, 1998. Nichols testified that he received copies of these financial statements in late 1998. The statements were prepared by Mary Stone, CPA.

14.    After receiving the financial statements, Nichols contacted Mary Stone and questioned her concerning the Partners' Capital Accounts numbers which Nichols believed did not accurately reflect Nichols' understanding of the partnership agreement. The 1996 capital account for Nichols was $293,423 and $13,368 for Stone. The 1997 capital account was $313,556 for Nichols and $108,746 for Stone. Nichols believed his 1996 capital account should have been at least $780,000 consisting of a $750,000 initial capital contribution and $30,000 in deferred rental payments from Stoney's.

15.    The statute of limitations has expired on the plaintiff's claim for a review of the handling of the initial transaction which occurred in 1995. Under Maryland law the statute of limitations for a civil case is three years from the date the claim accrues. Nichols had knowledge of the handling of the initial transaction and the establishment of the partners' capital accounts well before December 19, 2004.

16.    The partners' capital account for the years 1996 through 2007 as computed by the PAR accountant are as follows:

| Year | Nichols | Stone |
|------|---------|-------|

| 1995 | $293,423 | $ 13,368 |
| 1996 | $313,556 | $108,746 |
| 1997 | $326,752 | $216,398 |
| 1998 | $331,658 | $413,426 |
| 1999 | $335,109 | $538,804 |
| 2000 | $335,012 | $542,446 |
| 2001 | $318,719 | $549,251 |
| 2002 | $312,614 | $569,812 |
| 2003 | $287,020 | $578,574 |
| 2004 | $262,424 | $618,228 |
| 2005 | $248,022 | $644,613 |
| 2006 | $225,470 | $678,071 |
| 2007 | $202,845 | $1,051,741 |

Nichols received on an annual basis not only the financial statements from the CPA firm but also a K-1 which reflected the amount of his capital account on an annual basis. Nichols testified that he did not read the K-1 but stored it until he gave it to his accountant to aid in the preparation of his taxes.   The annual financial statements were summary in presentation and lacked detail. Nichols testified that he did not understand the financial material presented and the lack of detail hindered his ability to comprehend PAR's financial situation.   From Nichols' testimony at trial, it is clear that he has been dissatisfied with his partnership share and believes the partnership's books were not properly kept.   Nichols believes that all income belonging to PAR has not been booked, and that many expenses that are the responsibility of Stoney's have been charged to PAR.  With the exception of the two lawsuits Nichols filed in 2000 and 2003, Nichols was tepid in seeking information from either Stone or Mary Stone, CPA.  There were a few telephone calls, and a letter or two over a number of years.   Nichols very rarely visited the PAR property. Nichols has never made any contributions to his capital account since his initial contribution. The increase in Stone's capital account over Nichols' capital account is caused by (a) Stone's improvements to Stoney's, (b) the principal payments on the outstanding mortgage that Stone pays, and (c) one half of PAR's operating expenses, all three items are booked as Stone's capital

contributions.   Nichols complains of this accounting treatment as the capital improvements remain protected from depreciation and that upon dissolution of the partnership, Stone will recoup his entire investment in Stoney's that has been added to Stone's capital account.

17.     On May 16, 2000 Nichols sued Stone in the United States District Court for the District of Maryland - Civil Action No. MJG 00-1416.  Nichols was represented by James Gentile, Esq. of Silver Spring, Maryland and Stone was represented by Michael Connaughton, Esq. of Annapolis, Maryland.  In his complaint, Nichols contended that Stone had converted partnership funds and assets to his personal use, had used partnership funds to make payments on a note held by Maryland Bank and Trust Company for which Stone was personally responsible, had failed to use his (Stone's) best efforts to develop the Broomes Island Marina property as a source of income for the partnership, had not paid fair market rent on Stone's restaurant to the partnership, and had failed and refused to provide an accounting of partnership funds and assets despite Nichols' request that Stone do so.  Nichols testified that no discovery was conducted in this case or any judicial rulings entered.

18.     A settlement conference in the lawsuit outlined in the paragraph above was held on December 15, 2000 before Magistrate Judge Susan Gauvey at the United States Courthouse in Baltimore, Maryland.   A settlement was reached and the parties executed a Settlement Agreement on December 15, 2000.  The agreement provided that a new lease between PAR and Stoney's be executed which included terms more favorable to the partnership.  In addition, Stone granted to Nichols an irrevocable option to purchase Stone's full interest in PAR and BIYC for $1,200,000 provided the option is exercised no later than October 31, 2001. This $1,200,000 figure reflected the capital contribution of Stone, improvements in the property, and the increased value of the property.  Nichols and Stone also agreed to execute all papers necessary to

extend the Deed of Trust Note held by Maryland Bank and Trust Company secured by the Broomes Island Marina property.  Stone agreed to make all payments on the note personally. Finally, the parties agreed to dismiss the case with prejudice.  The case was dismissed on December 19, 2000 by Magistrate Judge James K. Bredar.   Under the terms of the December 19, 2000 Settlement Order, the dismissal of the case was with prejudice if no party moved within 60 days to reopen the action.  No party moved to reopen the action.  In 2001, shortly after the settlement, Nichols' accountant and Mary Stone, accountant for PAR, met at Mary Stone's office to review the books of PAR.

19.     A new lease was entered into between PAR and Stoney's in January 2001.  The new rent was $60,000 for the period January 1, 2001 through October 31, 2001 to be paid in equal monthly installments.   The new lease provided that all rental income from the slips and residential properties would be paid to PAR.   Stoney's would be responsible for all septic charges.  All of the terms of the previous lease made on June 28, 1995 were incorporated by reference in the new lease, provided the terms are not inconsistent with the terms in the new lease.  While the new lease expired by its own terms on October 31, 2001, no new lease has ever been executed.  The terms of the January 2001 lease still continue in effect.

20.     On August 13, 2003 Nichols sued Stone and PAR in the United States District Court for the District of Maryland - Civil Action No. RWT 03-2369.  Nichols was represented by Thomas Gentile, Esq. of Chevy Chase, Maryland and Stone and PAR were represented by Barbara Palmer, Esq. of Annapolis, Maryland.  Nichols alleged in Count 1 of the Complaint that PAR had failed to account to him as a limited partner of PAR for rent received from residential tenants, the marina, and the restaurant and other income for 2001 and 2002 and asked for an accounting.  Nichols alleged in Count 2 of the Complaint that Stone had breached his fiduciary

10

duty by using partnership revenues to pay non-partnership obligations, personal expenses and expenses of Stone's business and had entered into a lease involving PAR assets with an entity controlled by Stone at below-market rents, thus unfairly burdening PAR with the expenses of Stone's business.  Nichols raised approximately twenty questions through his counsel concerning the operations and finances of PAR.  Stone's counsel provided Nichols' counsel with written answers to these questions and supporting financial information.    The parties to this case dismissed the matter without prejudice on December 3, 2003.

21.    PAR did not maintain bank accounts.  PAR's financial transactions were conducted through accounts maintained and controlled by either Stone or entities that Stone controlled. There were no insurance policies until 2009 naming PAR as an insured entity.  While PAR's assets were insured, the policies were written in the name of Stoney's Seafood Inc., t/a Stoney's Seafood House, Louis Stone III, and Jeannie Stone.  There was co-mingling of PAR funds and expenses with the funds and expenses of businesses controlled by Stone.  In the years when PAR made distributions to Nichols, the checks were drawn on business accounts owned and controlled by Stone.

22.    In September 2003 Hurricane Isabel caused significant damage to the PAR property on Broomes Island.  There was no flood insurance for the property, even though the property is in a flood plain, and some of the damage was due to flooding.  Stone had insurance on assets of PAR, but PAR was not named as an insured.  PAR was not named as an insured until 2009.  Despite damage to PAR property and evidence of insurance proceeds being paid for damage to PAR property, none of the Financial Statements reflect any insurance proceeds being credited to PAR. The damage caused by Hurricane Isabel was repaired by Stone and the facilities were significantly improved and enlarged.  During the repairs Stone proffered to Calvert County thirty

boat slips to assist in meeting the County's parking requirements.  Nichols did not know of the parking proffer at the time it was made.

23.     On November 4, 2002 Elizabeth Fern Conner, Ruth Marie Denton and Mark E. Denton conveyed to Louis P. Stone, III for the consideration of $550,000.00 a piece of property called the Warren Denton Oyster House property.  This property was adjacent to the PAR property on Oyster House Road.   On February 26, 2004 PAR, acting through Stone, granted to Stone an easement onto PAR's property for the purpose of accepting, treating and processing sewage and affluent.   The consideration for the easement was one dollar. This sewage agreement is not a burden on the PAR property.   Based on the testimony of Daniel Kelsh, PAR's engineer, the agreement is improperly drafted and in fact, the neighboring Denton property provides a benefit to PAR by housing a sewage holding tank for PAR's waste which flows from the PAR property on to the Denton property.

24.     In March 2008 Stone applied to Calvert County for approval to construct a 26 slip marina on the Warren Denton Oyster House property.  Nichols testified that the rental income from slip rentals on the PAR property has declined.  A marina approximately a block away (Len's Marina) appears to operate at or near full occupancy.  With the exception of this observation by Nichols, there was no proof that there has been any demand by the public for the lease of slips at the Broomes Island Marina that have gone unfulfilled for any reason.  While Nichols testified that the marina at Bromes Island is a sheltered anchorage, this was disputed by Stone who testified that with the removal of the Oyster House the marina was more exposed to winds.   Stone strongly believes that the slips are not attractive for long term rentals because of the slips' exposure to adverse weather elements.  Stone does not keep any of his boats at the marina.  The number of slips has declined since 1995, although the quality of the remaining slips has

increased.  The slips now have 50 amp electrical service housed in new pedestals with new water service.  As stated earlier the marina bathrooms were rebuilt and additional bathroom space added.  The width of the slips range from ten feet to mid twenty feet and can accommodate boats up to fifty to sixty feet in length.  Some of the slips have limited use due to shallow water.  Testimony established the marina has no fuel service, repair facilities, lift service, or storage facilities.  While a number of slips have been allocated for transient use to satisfy parking requirements required by the Calvert County Office of Planning and Zoning, there is no evidence of any damage sustained by PAR as a result of these allocations.  There are 115 parking spots at the marina.

25.     Philip R. Baker, CPA of Regardie, Brooks & Lewis in Bethesda, Maryland was called as a witness by Nichols and qualified as an expert witness in accounting.  Mr. Baker reviewed the Partnership Return of Income and financial statements for PAR for the years 1996 - 2007, the summaries of income and expenses for PAR for 2001 - 2006, the lease and its modification, the 1995 loan documents and settlement sheet, the contract dated November 30, 1995,   the December 15, 2000 agreement, and BIYC's articles of incorporation and by-laws.  He prepared an analysis of rental income and expenses, balance sheets, and capital accounts based upon the assumption that rental income would be allocated 49.5% to Nichols, 49.5% to Stone, and 1% to BIYC and rental expenses, depreciation, taxes, professional fees and loss on disposal of assets were allocated in the same percentage as rental income.  All other expenses were allocated to Stone.  As a result of this analysis, Mr. Baker opined that the cash flow due to Nichols for the period 1996 - 2007 would be $349,391 and that Nichols' capital account should be increased by $218,039.  In accomplishing his retained task, Mr. Baker noted that PAR does not have its own set of books or its own bank accounts. He also noted that a number of capital improvements were

booked in 2007, although the improvements were acquired in 2004.  There was no depreciation taken on these improvements in 2004, 2005 and 2006.  On cross examination it was highlighted that Mr. Baker's analysis of net cash flow based on the assignment given him, was inconsistent with the PAR Limited Partnership Agreement definition of net cash flow in that it did not provide for capital improvement and principal payment deductions.  If the definition of net cash flow as set forth in the PAR Limited Partnership Agreement was used, there would be a negative cash flow.

26.     An appraisal dated February 16, 2004 and an appraisal dated April 17, 2008 for the Warren Denton Oyster House property which is adjacent to the PAR property on Oyster House Road was admitted into evidence.  As of February 16, 2004 the appraised value of the property was $1,000,000.00 and as of April 17, 2008 the appraised value of the property had increased to $1,790,000.00.  Nichols contends that the purchase of the Warren Denton Oyster House property by Stone is a misappropriation of a business opportunity which belonged to PAR.

27.     Jeannie Stone, a restaurateur and business manager for various Stone enterprises, was called to testify regarding Quick Book entries and allocation of expenses incurred by PAR. Jeannie Stone is not related to Louis P. Stone.  Jeannie Stone first became responsible for the business records of PAR after the first lawsuit in either 2001 or 2002.  Prior to that time Stone used an internal bookkeeper for his businesses.  Jeannie Stone testified that all Quick Book entries and accompanying invoices for repair and maintenance of PAR assets were provided to Nichols on an annual basis.  The same documents provided to Nichols were also provided to Mary Stone, CPA so that PAR's books and tax returns could be prepared. Jeannie Stone testified that she was responsible for allocating expenses between Stoney's and PAR and that she did not have an in depth understanding of the PAR Limited Partnership Agreement or the applicable

lease.  Her allocation of expenses was made pursuant to her understanding of general partnership principles and common sense.  There were no bank accounts for PAR.  All revenue and expenses were processed through Stone's business accounts.  Distributions to Nichols were made after the first lawsuit in an effort to appease Nichols.  These distributions were directed by Stone.  The amount available for distribution was calculated by deducting expenses from the rental income of PAR.

28.     In response to questions concerning insurance, Jeannie Stone replied that PAR was not a named insured on any of the policies for Broomes Island until 2009.  Annual insurance costs for all the property on Broomes Island runs from $45,000 to $48,000.  Nichols is assessed about $4000 a year for property and liability coverage.  A quote for flood insurance was obtained prior to Hurricane Isabel of approximately $8,000 per year.  This quote was considered high and not a good value and Jeannie Stone elected not to purchase flood insurance.  An additional reason not to purchase flood insurance was that flood insurance would not cover any buildings or decks built over the water.  A significant portion of Stoney's was built over the water.  Following Hurricane Isabel an insurance claim was made under the property coverage provisions of the applicable insurance policy.  Insurance proceeds were received beginning in late 2004.  Some insurance proceeds were attributed to PAR (roofing and flooring) and some proceeds were attributed to Stoney's (business loss income).  Insurance proceeds were not listed as income on the financial statements, as the proceeds were used to reduce the cost of repairs that were charged to PAR and Stoney's.

29.     David Kolb of the Henry M. Murray Agency, Inc. in Annapolis, Maryland was called as a witness.  Mr. Kolb is President of the Henry M. Murray Agency, has been an insurance agent for 32 years and has provided insurance services for ten plus years for Stoney's.  He has worked

with Louis Stone and Jeannie Stone.  Mr. Kolb first learned that PAR owned the properties in Broomes Island in December 2007.  Prior to that time the named insured on the policy was Stoney's Seafood Inc., t/a Stoney's Seafood House.  Also named as insureds were Louis Stone III and Jeannie Stone.  One must have an insurable interest in a property in order to be a named insured.  If PAR was not named either as a named insured or an additional insured, PAR would have no right to claim under the insurance policy.  Sometime in May or June 2009 PAR was added to the insurance policies.  Stoney's received approximately $43,000 in insurance proceeds as a result of Hurricane Isabel for business loss income, food spoilage, restaurant contents, clean-up, floor and roof damages.  Mr. Kolb breaks out the cost of insurance for each building on Broomes Island.  He does not break out insurance costs between PAR and Stoney's.

30.     Daniel Kelsh of Collinson, Oliff & Associates in Prince Frederick, Maryland was called to testify.  Mr. Kelsh has been a civil engineer since 1986 and is a Registered Professional Engineer in Maryland.  He is familiar with Calvert County zoning regulations and parking requirements.  In 1995 as a result of the removal of three trailers, one house, and five apartments and the creation of a new parking lot at the location of the removed trailers, 37 additional parking spaces were made available to count towards the establishment of a new restaurant with 1,850 square feet of patron space.  In 2005, 39 transient slips were designated as slips available to meet the parking requirements for Stoney's.  Under Calvert County regulations 30% of the required parking slots can be met by transient boat slips.  There must be one parking space for every 50 square feet of gross patron area.  Leased boat slips require one parking space for every two leased spaces.  Transient slips do not require a parking space, but rather count as a parking space.  An application for a variance to provide parking for leased slips at an adjoining off-site location (*e.g.* Warren Denton Oyster House property) could be submitted to the Calvert County zoning

authorities.  No evidence was produced of any individual requesting a leased slip space and not being provided one.

31.     Mary Stone, CPA of Mullen, Sondberg, Wimbish & Stone, P.A. located in Annapolis, Maryland was called as a witness.  Mary Stone has been the accountant for PAR since 1995.  She prepares on an annual basis PAR's Financial Statements, PAR's income tax returns and the K-1s for the partners. Mary Stone is the sister-in-law of Stone.  She is no relation to Jeannie Stone. Mary Stone receives from PAR management bookkeeping records which she analyzes to prepare the financial statements and tax returns.  The financial statements are compilation reports.  She takes information from PAR management and puts it into a financial statement format principally for tax purposes.  Mary Stone receives summaries of income and expenses.  She does not receive copies of bills nor does she audit the income and expenses of PAR. If Mary Stone has questions concerning income or expenses, she calls Jeannie Stone. The income and expenses of PAR were co-mingled with Stoney's business records. During the year as entries are made on Stoney's books by Jeannie Stone, the income and expenses are designated as belonging to either Stoney's or PAR by Jeannie Stone.

32.     In 1995 or 1996 Mary Stone testified that in preparing the initial tax returns she reviewed PAR's organizational documents and the transaction documents when the Broomes Island property was transferred to PAR.  Mary Stone was not part of the negotiations between Nichols and Stone.  Her actions were guided by the documents.  Mary Stone interprets the transaction of December 20, 1995 as a sale by Nichols of the Broomes Island property to PAR for $1,030,055.00, not a transfer of Nichols' interest.  Mary Stone believes the Settlement Statement reflecting a sale of the property superseded the other documents.  Mary Stone attempted several times to communicate with Nichols to explain the transaction and its capital gains tax

implications, but never received any return calls from Nichols. Mary Stone believes there is no other way to book the transaction.

33.     Mary Stone testified that in computing the capital account of Stone, he receives credit for payment on the principal of the mortgage and any improvements and equipment to PAR property. Since Stone or one of his entities pays all of the operating expenses of PAR, Stone receives credit to his capital account of one half of the operating expenses.

34.     Mary Stone testified that under Generally Accepted Accounting Principles (GAAP) she may merge income and expense items together that are separately listed on the bookkeeping records or reclassify some items. For example income from slip rentals and income from apartment rentals would be merged together as rental income. Individuals who provided cleaning services would not be listed separately, but rather those expenses would be combined under one expense classification of cleaning. Thus the financial statements of PAR would vary from the bookkeeping records of PAR. Mary Stone testified that she provided Nichols with PAR financial statements and tax return information every year. Nichols may have called Mary Stone five times in 13 years to ask a substantive question (as opposed to when the tax returns would be ready). Nichols attorney, Mr. Gentile, called once. Mary Stone testified that all inquiries were answered. During the discovery process in this litigation all of Mary Stone's files concerning PAR were copied and provided to Nichols.

35.     At the request of the defense counsel, Mary Stone calculated "net cash flow" for each of the years PAR has been in operation. Net cash flow is defined in the PAR Limited Partnership Agreement (Paragraph 9.1.1.1) as taxable income increased by depreciation and any non-taxable income and reduced by payments on the principal of any indebtedness, expenditures for capital improvements, additions or replacements, and reserves. There has never been a year in which

PAR had a net cash flow.  Distributions may not be made to partners under the terms of the partnership agreement unless there is a net cash flow.  Management does not have the discretion to disregard this restriction.  The cash distributions made to Nichols were improper.

36.     Leonard Pick of Realty Sales & Acquisitions, Inc. in McLean, Virginia was called by Nichols as an expert in leasing, lease provisions, retail, commercial and mixed-use leasing with a specialty in restaurant work.  The court permitted Mr. Pick to opine as to rental values.  Mr. Pick reviewed the June 1995 and January 2001 leases.  Mr. Pick opined that all maintenance (landscaping, trash removal, plumbing and electrical, grass mowing, cleaning, parking repair, security systems) would be the responsibility of a tenant in a typical commercial lease.  The two leases in question are double net leases as there is no provision dealing with real estate taxes.  Mr. Pick opined the rental terms of the two leases after November 1 , 2001 were unusual because there was no escalation clause or increase in rent between November 2001 and August 2009.  There is a hold over provision in the lease, but no rental increase.  The lease contains no increase in insurance coverage requirements.

37.     Michael P. O'Brien of O'Brien Realty in Solomons, Maryland was called as a witness by Stone and qualified as an expert in commercial leasing with a sub specialty in restaurant activities in Southern Maryland.  Mr. O'Brien is also a Certified Public Accountant.  He has 30 years of experience in real estate.  He testified that in most leasing transactions the landlord prepares the lease.   In Southern Maryland many lease arrangements with mom and pop operations start as a hand shake arrangement.  The lease arrangement in this case is poorly crafted.  Mr. O'Brien has frequently seen leases with no escalation clauses.  These are leases where the tenant intends to make significant improvements to the rental property.  Mr. O'Brien opined that the $5,000 a month rent is a fair and reasonable rent for this property.  Income

streams from restaurants are very unpredictable.  Mr. O'Brien compared Stoney's lease to leases at Clarke's Landing Restaurant, Cape St. Mary's Marina Restaurant, and Rivers Edge Restaurant and concluded Stoney's lease was appropriate.

38.     Leonard Pick was recalled as a rebuttal witness.  He had examined the three comparable properties and found differences between the comparable properties used by Mr. O'Brien and Stoney's.  Mr. Pick opined that Stoney's was a very pleasant dining experience with high aesthetic value.  The three comparable properties were of a lesser quality.  Clarke's Landing restaurant has a CPI[3] escalation clause in its lease.  Cape St. Mary's Marina Restaurant is now closed and the facility is currently used as a marine construction office.  Rivers Edge Restaurant's rent is now $5,000 shortly going to $6,000.  The tenant at Rivers Edge Restaurant pays 85% of real estate taxes, one half of flood insurance premiums and is responsible for all maintenance and alterations.  Mr. Pick opined that Stoney's is the nicest facility with the best surrounding area demographics in relation to the comparable restaurants.

## Conclusions of Law

1.     "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."  MD. CODE ANN., CTS. & JUD. PROC. § 5-101 (LEXIS NEXIS 1974, 2006 REPL. VOL.).

2.     "[T]he question of accrual in § 5-101 is left to judicial determination."  *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95, 756 A.2d 963, 973 (2000).

3.     The Court of Appeals of Maryland has adopted the discovery rule to determine the date of accrual.  *Id.* at 95, 756 A.2d at 973.

4.     "The discovery rule tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury."  *Id.* at

---

[3]  Consumer Price Index

95-96, 756 A.2d at 973.

5.      Ordinarily this discovery rule applies to all actions governed by the three year statute of limitations.  *Id.* at 96, 756 A.2d at 974.

6.      On May 16, 2000 Nichols filed a complaint against Stone.  In that lawsuit "Nichols alleged that Stone had failed to fulfill all of his obligations and perform all of his duties under the Agreement, that Stone converted PAR funds and assets to his personal use, that Stone failed to use his best efforts to develop the Property as a source of income for PAR, that Stoney's had failed to pay fair-market rent, and that Stone had failed and refused to provide an accounting of PAR funds and assets despite repeated requests."  2007 Compl. ¶ 49.

7.      With the assistance of Magistrate Judge Gauvey, on December 15, 2000, Nichols and Stone settled the lawsuit contingent upon, among other things, a new lease being executed between PAR and Stoney's.  In the agreement settling the case Stone granted Nichols an irrevocable option to purchase Stone's full interest in PAR and BIYC for the sum of $1,200,000.00 as long as the option is exercised by October 31, 2001.

8.      A new lease was executed in January of 2001.  The new lease between PAR and Stoney's included new terms more favorable to PAR.  This new lease superseded any inconsistent provisions of the June 28, 1995 lease but otherwise incorporated by reference the terms of the June 28, 1995 lease.  The January 2001 lease, by its own terms, was effective for ten months expiring October 31, 2001.

9.      On August 13, 2003 Nichols filed a Complaint for Accounting against PAR Limited Partnership and Stone.  In count one Nichols alleged, PAR (as managed by Stone) (a) failed and refused to provide Nichols with any information concerning PAR's business and affairs, (b) failed to provide Nichols an accounting of rent received from residential dwellings owned by

PAR for 2001 and 2002, (c) failed to provide Nichols an accounting of rent received from the marina (Broomes Island) owned by PAR for 2001 and 2002, (d) failed to provide Nichols an accounting of the total amount of rent and other income received from Stoney's which PAR owned for 2001 and 2002, and (e) failed to explain or document expenses PAR incurred in 2001 and 2002.

10.      In count two Nichols alleged Stone, who controlled PAR, (a) utilized PAR revenues to pay non-PAR obligations, (b) used PAR revenue to pay personal expenses and the expenses of Stone's business, (c) contrary to Stone's fiduciary duties as a partner, Stone secretly utilized PAR to further his own financial interests at the expense of Nichols and PAR, and (d) burdened PAR with the expenses of Stone's business.

11.      On November 24, 2003 Nichols and Stone submitted a praecipe requesting the case be dismissed without prejudice.  On December 3, 2003 Judge Titus approved the praecipe and the case was closed.

12.      On December 19, 2007 Nichols, derivatively on behalf of PAR, sued Stone, Jeannie Stone, Stoney's and BIYC.  In this ten count complaint Nichols alleges (1) breach of contract against Stone and Stoney's, (2) unjust enrichment against Stone and Stoney's, (3) tortious interference with contractual relations against Stone and BIYC, (4) tortious interference with prospective advantage against Stone and BIYC, (5) breach of fiduciary duty against Stone and BIYC, (6) intentional misrepresentation against Stone, BIYC and Jeannie Stone, (7) constructive fraud against Stone and BIYC, (8) fraudulent concealment against Stone and BIYC, (9) preliminary and permanent injunction against Stone, and (10) a need for an independent accounting.

*Count I:  Breach of Contract against Stone and Stoney's*

13.     Nichols alleges Stone and Stoney's (a) failed to pay rent as required by the lease since January of 2001, (b) failed to pay rent from residential units to PAR in accordance with the lease and (c) failed to utilize marina slips to generate income for PAR.

14.     Based on information presented during the four day bench trial Nichols now asserts the breach of contract by Stone and Stoney's consisted of (a) improperly deducting maintenance and septic expenses from Stoney's rent beginning in 1998, (b) improperly deducting other expenses Stoney's agreed to assume pursuant to the lease beginning in 2002, (c) failing to pay rent due from Stoney's on a monthly basis, and (d) failing to obtain adequate insurance coverage for PAR, charging PAR for insurance premiums but not naming PAR as the insured of the policy until 2009.

15.     Nichols asserts the breach of contract claim is not barred by the statute of limitations under the "continuation of events" theory which tolls the statute of limitations when there is a fiduciary relationship between the parties.

16.     Under the "continuation of events" theory the statute of limitations is tolled "where a [fiduciary] relationship exists between the parties." *Frederick Road Ltd. P'ship*, 360 Md. at 97, 756 A.2d at 974.

17.     It is undisputed that, after the lawsuit filed in 2000 resulting in the January 2001 lease, Jeannie Stone mailed to Nichols an income and expense report for PAR each year beginning in 2001.

18.     The expenses Jeannie Stone attributed to PAR included items such as trash removal, utilities and management fees.

19.     Nichols testified that deducting these expenses from PAR was contrary to June 28, 1995 lease as continued by the January 2001 lease.

20.     Nichols was aware these expenses should not have been charged to PAR because, in the lawsuit filed in 2003, Nichols alleged "[t]he partnership has refused to explain or document expenses incurred by the partnership during calendar years 2001 and 2002."  2003 Compl. ¶ 9.

21.     Nichols knew expenses were being incurred by PAR improperly and/or knew expenses were being incurred but Stone failed to provide documentation for these expenses.

22.     "[O]nce a plaintiff is aware that it has been harmed, 'a potential plaintiff is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury.'"  *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 169, 857 A.2d 1095, 1105 (2004) (quoting *Doe v. Archdiocese of Washington*, 114 Md. App. 169, 188, 689 A.2d 634, 644 (1997)).

23.     Although the "continuation of events" theory allows Nichols *the right to relax his guard and rely on the good faith of Stone as long as the fiduciary relationship continues to exist*, the "continuation of events" theory does not completely eliminate Nichols' duty to investigate claims against a fiduciary.

24.     "[D]espite the existence of a fiduciary relationship among the parties, the statute of limitations would begin to run against an aggrieved party if that party had knowledge of facts that would lead a reasonable person to undertake an investigation that, with reasonable diligence, would have revealed wrongdoing on the part of the fiduciary."  *Dual Inc.*, 383 Md. at 174, 857 A.2d at 1108 (citing *Frederick Road Ltd. P'ship*, 360 Md. at 99-100, 756 A.2d at 975-76).

25.     Nichols acknowledged during the bench trial and, also admitted in his Closing Brief and Recommended Findings of Fact and Conclusions of Law, his awareness that "[b]eginning in

1998, Stoney's began deducting from the rent it owed maintenance and septic expenses in breach of the lease." Document No. 51 at 7. A reasonable person, under such circumstances would undertake an investigation with reasonable diligence. What investigation Nichols undertook is uncertain but what is clear is Nichols sued Stone in 2000.

26.     According to Nichols, beginning in 2002, "despite no changes to the lease concerning expense allocations, Stone caused Stoney's to begin offsetting its rent by many other expenses, including cleaning, insurance, trash removal, utilities, management fees and other expenses either specifically designated as tenant expenses under the lease or otherwise not authorized in the lease as landlord expenses." *Id.* Nichols became aware of these "unauthorized expenses" based on the yearly expense report Jeannie Stone compiled and sent to Nichols.

27.     As documented in the 2003 Complaint for Accounting, Nichols knew PAR, as managed by Stone, failed to explain or document the expenses PAR incurred in 2001 and 2002. A reasonable person, under such circumstances, would undertake an investigation with reasonable diligence. What investigation Nichols undertook is uncertain but what is clear is Nichols sued both PAR and Stone in 2003.

28.     Nichols knew in 1998 and again in 2002 that Stone was not allocating expenses in accordance with the lease. Because such information would have led a reasonable person to undertake an investigation with reasonable diligence, Nichols cannot invoke the "continuation of events" theory to toll the statute of limitations. These claims are barred by the statute of limitations.

29.     "If the confiding party . . . has actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or is in possession of facts which put such a party upon inquiry which would disclose such an abuse, then the applicable statute of

limitations begins to run at the time of receiving actual knowledge or of facts placing the confiding party upon inquiry[.]" *Frederick Road Ltd. P'ship*, 360 Md. at 101, 756 A.2d at 976.

30.     For the same reasons discussed above, Nichols' allegation that Stoney's failed to pay the rent due monthly in accordance with the lease is barred by the statute of limitations. First, based on the PAR Financial Statements received from Mary Stone, PAR's CPA, as of 1998, Nichols questioned whether Stoney's was operating consistently with the lease including paying the stated amount of rent. Second, when Nichols began receiving, as of 2001, the yearly report of expenses and income from Jeannie Stone, Nichols challenged the expenses charged to PAR and questioned the amount of rent Stoney's paid. A reasonable person, under such circumstances, would undertake an investigation with reasonable diligence. By filing a lawsuit in 2000 and later in 2003, Nichols was clearly dissatisfied with the rent Stoney's paid. Nichols settled the 2000 lawsuit and voluntarily dismissed without prejudice the 2003 lawsuit. Nichols' claim regarding Stoney's rent is barred by the statute of limitations.

31.     Finally, Nichols alleges Stone breached the lease by not obtaining adequate insurance coverage and further, only in 2009, did Nichols learn the insurance policy for which PAR paid the premiums did not name PAR as the insured but named Stone, Jeannie Stone and/or Stoney's as the insured.

32.     Jeannie Stone testified because the insurance premiums were very high and the coverage was limited to property *not* over the water, she thus elected not to obtain flood insurance. Stone delegated to Jeannie Stone the authority to run the day-to-day operations of PAR including Stoney's. Jeannie Stone's decision was an exercise of business judgment.

33.     While PAR should have been the named insured since the inception of the policy, PAR's assets were nonetheless insured. Since PAR's assets were insured adequately, no breach of

contract occurred.

34.     Judgment as to Count I will be entered in favor of Stone and Stoney's and against Nichols.

*Count II:  Unjust Enrichment against Stone & Stoney's*

35.     The Court has found that the terms of the January 2001 lease still continue in effect.  That lease and the earlier lease of June 28, 1995 (to the extent not superseded by the January 2001 lease) control the rights and obligations of the parties.  Stone testified that from January 2001 to the present, he has been operating PAR under the guidelines of the January 2001 lease.

36.     Nichols received PAR Financial Statements from Mary Stone, PAR's CPA since 1998 and from Jeannie Stone yearly income and expenses report for PAR since 2001.

37.     The January 2001 lease listed the amount of monthly rent Stoney's owed PAR.  Nichols was represented by counsel when this lease was drafted.  Nichols signed the lease.

38.     If Nichols believed the monthly rent paid by Stoney's to PAR does not reflect fair market value, Nichols should have asked his counsel to include an escalation clause in the lease.  No such clause was incorporated into the lease.

39.     Nichols, as Secretary/Treasurer of PAR, should have requested an annual meeting or an emergency meeting of the Board of Directors if Nichols believed Stoney's was not paying fair market value for the monthly rent.  As revealed during the bench trial, since the initial meeting in 1995, there have not been any meetings of the directors or stockholders of either BIYC or PAR nor any elections held.

40.     Nichols has failed to demonstrate Stoney's did not pay rent monthly.  Even if Stoney's failed to pay rent monthly (but all rent was paid and accounted for yearly), Nichols knew how rental payments were handled, at least as early as 2001.  A reasonable person, under such

circumstances, would undertake an investigation with reasonable diligence.  What investigation Nichols undertook is unclear.

41.     In his 2003 Complaint for Accounting, Nichols raised concerns about the accounting of rent received from Stoney's, residential dwellings and the marina.  The filing of this complaint reflects Nichols' doubts, mistrust and/or suspicions about Stone and Stoney's.  "The confiding party . . . is under no duty to make inquiries about the quality or bona fides of the services received, unless and until something occurs to make him or her suspicious."  *Frederick Road Ltd. P'ship*, 360 Md. at 98, 756 A.2d at 975.

42.     Nichols' 2007 Complaint concerning unjust enrichment by Stone and Stoney's with regard to Stoney's monthly rent is barred by the statute of limitations.

43.     Judgment as to Count II will be entered in favor of Stone and Stoney's and against Nichols.

*Count III:  Tortious Interference with Contractual Relations against Stone and BIYC*

44.     In support of this count Nichols alleges "[n]otwithstanding his knowledge of the lease through his control over Stoney's, Stone, individually and/or as President of BIYC, intentionally, or with reckless disregard for the contractual rights and obligations of the parties, improperly and without legal justification, caused Stoney's to breach the lease by not paying rent and/or offsetting improper expenses from rent owed to PAR."  Document No. 51 at 14.

45.     In further support of this count Nichols alleges "Stone intentionally, or with reckless disregard, allowed [Jeannie] Stone and Mary Stone to improperly record Stoney's expenses as PAR expenses on PAR Financial Statements, offsetting such improper expenses against rent due to PAR, which caused Stoney's to be in breach of its lease with PAR.  As a result of Stone's and/or BIYC's intentional misconduct, PAR and Plaintiff were improperly deprived of revenues

and suffered damages and the full benefit of the PAR lease." *Id.* at 14-15.

46.     At the bench trial Stone testified, after the 2000 lawsuit, he delegated the handling of day-to-day operations of Stoney's, the residential dwellings, and the marina slips to Jeannie Stone.

47.     Jeannie Stone testified that she never knew of and thus never read either the June 28, 1995 lease or the January 2001 lease concerning PAR.

48.     Jeannie Stone also testified, based on her personal experience with different partnerships, she allocated certain expenses to PAR.

49.     The Court concludes, pursuant to the January 2001 lease, certain expenses charged to PAR, specifically utilities and septic, were contrary to the terms of the lease.

50.     As of January 2001, Jeannie Stone sent to Nichols each year a list of expenses charged to PAR and income received by PAR.

51.     Nichols acknowledged receiving the annual reporting from Jeannie Stone.

52.     In 2003 Nichols sued PAR and Stone alleging, among other things, that (a) PAR failed to explain or document expenses PAR incurred in 2001 and 2002 and (b) Stone burdened PAR with the expenses of Stone's business, *i.e.*, Stoney's.

53.     This 2003 lawsuit is indicative of Nichols having knowledge of facts that would lead a reasonable person to undertake an investigation, with reasonable diligence, to determine if there is any wrongdoing on the part of the fiduciary.

54.     In voluntarily dismissing the 2003 lawsuit without prejudice, Nichols had an opportunity to reopen the matter.  Nichols never did.

55.     "If the confiding party . . . has actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or is in possession of facts which

put such a party upon inquiry which would disclose such an abuse, then the applicable statute of limitations begins to run at the time of receiving actual knowledge or of facts placing the confiding party upon inquiry[.]"  *Frederick Road Ltd. P'ship*, 360 Md. at 101, 756 A.2d at 976.

56.     Nichols' claim of tortious interference with contractual relations against Stone and BIYC is barred by the statute of limitations.

57.     Judgment as to Count III is entered in favor of Stone and BIYC and against Nichols.

*Count IV:  Tortious Interference with Prospective Advantage against Stone and BIYC*

58.     Nichols cites two bases for this count.

59.     "Stone, acting as President of the General Partner, in breach of his fiduciary duty to PAR, intentionally converted PAR marina boat slips to transient slips for his own personal benefit of providing parking spaces for a restaurant he owns, and causing damage to PAR by way of limiting PAR's ability to earn income from renting the marina slips, and without paying a fair market rate for the marina slips now dedicated to the restaurant."  Document No. 51 at 16.

60.     In further support of this first basis, Nichols charges, "Stone and BIYC have interfered with PAR's prospective relationship with Stoney's by causing Stoney's to take advantage of PAR's marina slips without paying rent to PAR for the slips it now uses as parking spaces.  PAR is damaged by the amount of the fair market value of these slips now occupied by Stoney's. Testimony established that these slips are worth between $500 and $1,200 per year."  *Id.*

61.     It is undisputed that after Hurricane Isabel severely damaged PAR property on Broomes Island, Stone repaired the property.   The facilities on Broomes Island were significantly improved and enlarged.

62.     With a larger restaurant Stone needed additional parking spaces to comply with Calvert County's parking requirements.  Stone, in fact, proffered to Calvert County thirty boat slips to

meet the County's parking requirements.

63.     According to Stone and Jeannie Stone there is not a great demand to rent marina slips at the Broomes Island Marina.

64.     Nichols testified that at a nearby property (Len's Marina), slip rentals appear to be at or near full occupancy.  Nichols, who has visited Broomes Island Marina infrequently since the formation of PAR, offered no proof of any demand by the public for the rental of marina slips at Broomes Island Marina being unfulfilled for any reason.

65.     Stone who has managed the Broomes Island Marina since the formation of PAR and is very familiar with surrounding properties, testified that with the removal of the Oyster House, Broomes Island Marina was more exposed to winds.  Stone opined Broomes Island Marina's slips are not attractive for long term rentals because the marina slips are exposed to adverse weather conditions.

66.     Stone has increased the quality of the marina slips.  The marina slips now have 50 amp electrical service housed in new pedestals with new water service.  The width of the marina slips has been expanded to accommodate boats up to fifty to sixty feet in length.

67.     Stone and Jeannie Stone testified that Broomes Island Marina has no fuel service, repair facilities, lift service or storage facilities for boats.  Further, some of the marina slips have limited use due to shallow water.

68.     While a number of marina slips have been allocated for transient use to satisfy parking requirements mandated by the Calvert County Office of Planning and Zoning, there is no evidence of any damage sustained by PAR as a result of these allocations.

69.     A second basis for this count is the loss of an opportunity.

70.     "Stone also purchased property adjacent to PAR property, and as the President of BIYC,

intentionally caused a sewage agreement to be recorded encumbering PAR property by allowing Stone to deposit sewage from his adjacent property onto PAR property.  PAR has been damaged to the extent that its property has diminished in value, beyond the one dollar set forth in the agreement as consideration.  Stone has intentionally failed to cause BIYC to demand fair market value for the sewage agreement."  Document No. 51 at 16-17.

71.    On November 4, 2002 Stone, in his individual capacity, purchased a piece of property called the Warren Denton Oyster House.  This property is adjacent to the PAR property on Oyster House Road.

72.    On February 26, 2004 PAR, acting through Stone, granted to Stone an easement onto PAR's property for the purpose of accepting, treating and processing sewage and affluent.  The consideration for this easement was one dollar.

73.    Contrary to Nichols' testimony, the sewage agreement is not a burden on the PAR property nor has the value of the PAR property been diminished by the sewage agreement.

74.    As explained by Daniel Kelsh, PAR's engineer, the sewage agreement, as recorded in the records of Calvert County, is improperly drafted.  Moreover, as Daniel Kelsh testified, the neighboring Warren Denton Oyster House property provides a benefit to PAR by housing a sewage holding tank for PAR's waste on the Warren Denton Oyster House property.

75.    Regarding the first basis for this count (conversion of rental slips to non-rental parking spaces), this concern was raised by Nichols in both his 2000 lawsuit as well as the 2003 lawsuit. In 2000 Nichols claimed Stone failed to use his best efforts to develop Broomes Island Marina as a source of income for PAR.  Nichols believed Stone neglected to promote the leasing of the marina slips.  In 2003 Nichols alleged Stone utilized PAR to further Stone's own financial interests at Nichols' and PAR's expense.  From Nichols' perspective, converting marina slips to

parking spaces hurt Nichols and PAR because of the loss of income but benefited Stone's business, Stoney's, which had more parking space for customers.

76.     Nichols was aware, or at least suspected, that Stone was not promoting the rental of marina slips thereby reducing PAR's income.  Nichols therefore reasonably should have known of the wrong when he had "knowledge of sufficient facts to cause a reasonable person to investigate further." *Pennwalt Corp. v. Nasios*, 314 Md. 433, 443, 550 A.2d 1155, 1160 (1988). Nichols could have visited Broomes Island Marina or simply called Stone to inquire about the rental of marina slips.  What investigation Nichols undertook is unclear.  Because Nichols was aware of the conversion of rental marina slips to non-rental parking spaces when he filed his 2003 Complaint for Accounting, this count is barred by the statute of limitations.

77.     For the conversion of rental marina slips to non-rental parking spaces which occurred *after* the 2003 lawsuit was voluntarily dismissed without prejudice, Nichols has not proven any damages and thus fails to prove a tortious interference with prospective advantage against Stone and BIYC.

78.     Regarding the second basis for this count (the sewage agreement), to prove a tortious interference with prospective advantage, Nichols must demonstrate "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiff[s] in their lawful business; (3) done with an unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damages and loss resulting." *Abbott v. Gordon*, Civil Action No. DKC 09-0372, 2009 WL 2426052, at *7 (D. Md. Aug. 6, 2009) (quoting *Carter v. Aramark Sports and Entm't Servs., Inc.,* 153 Md. App. 210, 240, 835 A.2d 262 (2003) (internal quotations omitted), *cert. denied*, 380 Md. 231, 844 A.2d 427 (2004)).

79.     Nichols fails to prove any of the elements of this claim.  There is no evidence the sewage

agreement diminished the value of PAR's property.  In fact, according to the testimony of Daniel Kelsh, the sewage agreement *benefitted* PAR's property.

80.     Judgment as to Count IV is entered in favor of Stone and BIYC and against Nichols.

*Count V:  Breach of Fiduciary Duty against Stone and BIYC*

81.     In his 2007 Complaint Nichols charges Stone and BIYC breached their fiduciary duty "by representing both PAR and Stoney's at the same time, causing PAR to enter into agreements with Stoney's that were unfair to PAR, failing to protect the interest of PAR by failing to properly obtain adequate insurance for PAR property and/or improperly allocating insurance proceeds received by Stone for claims made for damage to PAR property, failing to negotiate and enforce a fair lease arrangement with Stoney's, failing to use their best efforts, or even reasonable efforts to rent marina slips, and abusing their fiduciary positions to intentionally, or recklessly misdirect PAR assets and money to Stoney's."  2007 Compl. ¶ 95.

82.     The Court has already addressed most of the matters raised in paragraph 95 of the 2007 Complaint.  *See supra*.  For the reasons stated above, these various matters are barred by the statute of limitations.

83.     Regarding the allegation that Stone and BIYC represented both PAR and Stoney's at the same time, Nichols consented to Stone's multiple responsibilities, namely (a) a tenant of PAR (as owner of Stoney's), (b) a limited partner of PAR and (c) the managing member of BIYC, the general partner of PAR.

84.     After the bench trial Nichols has limited this count to one charge — failing to give PAR the opportunity to purchase the adjacent property when it became available.

85.     "As set forth in the corporate and partnership documents, BIYC and PAR have, as their purpose, development and rental of real estate.  The fact that ownership of the adjacent property,

known as the [Warren Denton Oyster House] property, would have substantially benefitted and advanced the purposes of BIYC and PAR has been established by virtue of the uses that Stone has established for the property."  Document No. 51 at 19.

86.     "Stone has also developed the adjacent property to serve as a banquet facility, which supplements the Stoney's restaurant operation, thus improving revenue for the restaurant, and thereby, the rental value of the restaurant property.  Additionally, the banquet facility on the [Warren Denton Oyster House] property has been marketed to include a Bed and Breakfast, which is on PAR property.  The ownership of the [Warren Denton Oyster House] property would have supported additional rent for PAR."  *Id.*

87.     At trial Nichols asserted Stone failed to advance PAR's interest.  According to Nichols, as President of BIYC, Stone should have acquired the adjacent property on behalf of PAR.

88.     Nichols asserts Stone has violated the "corporate opportunity doctrine" by purchasing the adjacent property for his (Stone's) own benefit, usurping a business opportunity for PAR.

89.     Under Maryland law directors and officers of a corporation have a fiduciary relationship with the corporation.  *See Merchants Mortgage Co. v. Lubow*, 275 Md. 208, 215, 339 A.2d 664, 669 (1975).

90.     "[A]s a corollary to the law of a corporate officer's and director's fiduciary duty, that, when presented with a business opportunity to fulfill a corporate purpose, [the director or officer] should take advantage of it, not for himself, but for the corporation."  *Pittman v. Am. Metal Forming Corp.*, 336 Md. 517, 522, 649 A.2d 356, 359 (1994) (quoting *Faraclas v. City Vending Co.*, 232 Md. 457, 463-64, 194 A.2d 298, 301 (1963)) (alteration in original).

91.     In the contract of November 30, 1995, by and between Nichols, Stone and BIYC, the purpose of the PAR Limited Partnership is defined.  "The purpose of the partnership is to

acquire, develop, and manage the property known as Broomes Island Marina, including all residential and commercial improvements located thereon." Pl.'s Ex. 2 at 1.

92.     "The parties contemplate the expansion of activities *on the site* to include, among other things, an additional restaurant." *Id.* (emphasis added).

93.     The purpose of PAR is further defined in the Limited Partnership Agreement of November 30, 1995.

> 4.     *Purposes*.   The purposes for which the Partnership is formed are as follows:
>
> 4.1     The Partnership shall acquire in fee simple a track of real property located on Broomes Island, Maryland.  Said tract of real property together with the improvements thereon and appurtenances thereto shall be hereinafter referred to as the "Property."
>
> 4.2     The Partnership may sell all or any part of the Property.
>
> 4.3     The Partnership may also do and engage in any and all other things and activities incident to the acquisition, holding, management, operation, leasing, development and sale of the Property.
>
> 4.4     The Partnership may engage in any other business or make any other transaction which the general partner, in its sole discretion, shall deem to be reasonably related to the furtherance of the foregoing purposes of the Partnership as a whole.

Pl.'s Ex. 3 at 2.

94.     The Court concludes neither the November 30, 1995 contract of the general and limited partners nor November 30, 1995 Limited Partnership Agreement specifically identified as a purpose of PAR the acquisition of adjacent land.  As reflected in these documents, the purpose of PAR was the acquisition, development and management of Broomes Island Marina.  Therefore, Stone, as the managing member of BIYC (the general partner of PAR) had no duty to purchase

adjacent property in the name of PAR.

95.     Stone's acquisition of the Warren Denton Oyster House property did not usurp a business opportunity rightfully belonging to PAR.  Stone's acquisition of this property therefore does not constitute a violation of the "corporate opportunity doctrine."

96.     Nichols fails to prove a breach of fiduciary duty by Stone and BIYC.

97.     Judgment as to Count V is entered in favor of Stone and BIYC and against Nichols.

*Count VI:  Intentional Misrepresentation against Stone and BIYC*

98.     In his 2007 Complaint Nichols alleges Stone and BIYC falsely represented (a) "that adequate insurance policies were in place to protect PAR as required by the Agreement and duties that Stone assumed on behalf of PAR[,]" 2007 Compl. ¶ 98, (b) "that proceeds from insurance claims on policies covering PAR property were properly allocated to PAR[,]" *id.* ¶ 99, (c) "that repair and renovation costs were properly allocated in accordance with the Lease and the best interest of PAR, and/or that expenses and other items Stone caused Stoney's to charge to PAR or deduct from rent were proper and authorized by the Lease[,]" *id.* ¶ 100 and (d) "that proper insurance policies, financial accounts, trust accounts or other similar accounts, which were free from comingling with Stoney's, Stone's or other third-party assets, or other financial irregularities, were maintained on behalf of PAR[,]" *id.* ¶ 101.

99.     After the bench trial the focus of Nichols' allegations regarding this count is the issue of insurance.

100.    "Stone and BIYC as General Partner falsely represented to PAR partners that it had been paying for insurance covering PAR.  The evidence at trial proved that until this year, PAR was not a named insured on any insurance policies, and Stone and [Jeannie] Stone knew this to be true.  Some or all of these policies named Stone, [Jeannie] Stone and or Stoney's Seafood House

concerning property that Phil Stone and Jeannie Stone knew, or should have known they did not own and for which they had no insurable interest. Stone and [Jeannie] Stone intentionally, or with reckless disregard for the truth, misrepresented through the expense entries in PAR Financial Statements that PAR had insurance coverage. These misrepresentations were made for the purpose of defrauding PAR to the benefit of Stoney's. Stoney's benefitted by fraudulently passing to PAR certain operating costs for which it had no right to pass to PAR. PAR partners, including Plaintiff, had a right to and did rely on the representations by Stone and BIYC, based on the fiduciary relationship among the partners. Plaintiff and PAR were damaged because PAR assets suffered uninsured damage from a storm that would have been covered by insurance. Additionally, PAR was damaged in that it paid premiums beginning in 2002 for insurance that it did not have." Document No. 51 at 22.

101.    To prove fraud or misrepresentation by clear and convincing evidence under Maryland law, Nichols must demonstrate

> (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

*Hoffman v. Stamper*, 358 Md. 1, 28, 867 A.2d 276, 292 (2005).

102.    During the four day bench trial it was revealed that Stone had delegated the day-to-day operations of Stoney's and other PAR property to Jeannie Stone.

103.    Jeannie Stone knew a partnership called PAR existed. Jeannie Stone however never read the June 28, 1995 lease, the November 30, 1995 contract, the November 30, 1995 limited partnership agreement or the January 2001 lease.

38

104.   Starting in 2001 Jeannie Stone sent Nichols a yearly total of PAR's expenses (and sometimes PAR's income).   Insurance is listed each year as an expense.   PAR incurred the following insurance expenses: (a) $4,047.50 in 2001, (b) $5,497.50 in 2002, (c) $11,205.00 in 2003, (d) $9,359.40 in 2004, (e) $14,331.90 in 2005, (f) $14,606.50 in 2006, and (g) $15,555.00 in 2008.  *See* Pl.'s Ex. 13.  The insurance expense for 2007 could not be located and thus was not presented during the bench trial.

105.   Nichols knew and expected PAR to incur insurance expenses relating to insuring PAR's property.

106.   Nothing on the face of the yearly expense report would have alerted Nichols that PAR was not the named insured on the policy.

107.   Nothing on the face of the yearly expense report would have alerted Nichols that Stone, Jeannie Stone and/or Stoney's Seafood House was/were the named insured(s) on the insurance policy although PAR paid the insurance premium.

108.   Even if Nichols had notice that Stone was improperly allocating expenses to PAR contrary to the June 28, 1995 lease and the January 2001 lease, this misallocation should not have and would not necessarily cause Nichols to suspect that Stone was not properly insuring PAR's interest.

109.   It is undisputed that despite PAR incurring insurance premium expenses yearly, PAR was not a named insured on the policy until 2009.

110.   Nichols has proven by clear and convincing evidence that Stone and BIYC falsely represented that PAR was the insured on the insurance policy.

111.   The falsity of Stone's and BIYC's representation was made with reckless indifference.

112.   Nichols has not proven that Stone's and BIYC's misrepresentation was made for the

purpose of defrauding Nichols.

113.    Nichols relied on Stone's and BIYC's representation that PAR was insured and had a right to rely on Stone's and BIYC's representation since Stone, as the managing member of BIYC (the general partner of PAR), was responsible for managing PAR.

114.    Nichols did not suffer compensable damages as a result of Stone's misrepresentation. Nichols alleges damages for insurance premiums paid from 2002 – 2008 for a policy that named Stone, Jeannie Stone and/or Stoney's Seafood House as the insured, not PAR.  PAR had insurance as demonstrated by the payment of claims submitted following Hurricane Isabel.

115.    In addition, Nichols is unable to prove his claim of intentional misrepresentation against Stone and BIYC because Nichols has not proven the third element, *i.e.*, the purpose of listing Stoney's, Stone and Jeannie Stone on the insurance was to defraud Nicholas, as opposed to inept management.

116.    Judgment as to Count VI will be entered in favor of Stone and BIYC and against Nichols.

*Count VII:  Constructive Fraud against Stone and BIYC*

117.    To establish a claim of constructive fraud Nichols must prove (1) Stone and BIYC made a false representation of a material fact; (2) Stone and BIYC knew the representation was false or made the representation with such reckless disregard to the truth that it would be reasonable to charge Stone and BIYC with knowledge of its falsity; (3) Stone and BIYC intended that Nichols would rely on the false representations; (4) Nichols justifiably relied on Stone's and BIYC's representations; and (5) Nichols suffered damages as a result of reliance on Stone's and BIYC's representations.  *Crawford v. Mindel*, 57 Md. App. 111, 119, 469 A.2d 454, 458 (1984).

118.    Nichols must prove each element by clear and convincing evidence.  *Colandrea v. Colandrea*, 42 Md. App. 421, 428, 401 A.2d 480, 484 (1979).

119.    In his 2007 Complaint Nichols alleges Stone and BIYC owed him a fiduciary duty "to properly supervise and manage the partnership."  2007 Compl. ¶ 107.

120.    "Stone and BIYC breached their fiduciary duty to Nichols and PAR intentionally, with malice, and/or reckless disregard for Nicholas' and PAR's rights by ignoring the operation of PAR, failing to collect proper rent, and/or failing to prevent Stoney's and Stone from diverting PAR funds and assets, or otherwise acting willfully and contrary to the best interest of PAR."  *Id.* ¶ 109.

121.    After the four day bench trial Nichols identified another circumstance whereby Stone and BIYC did not act in the best interest of PAR.

122.    "Stone and BIYC, as general partners, falsely represented to PAR partners that it had been paying for insurance covering PAR. . . .Some or all of these policies named Stone, [Jeannie] Stone or Stoney's Seafood House concerning property that Stone and [Jeannie] Stone knew they did not own and for which they had no insurable interest.  Expense entries in PAR Financial Statements represented that insurance had been purchased covering PAR.  Nichols was damaged because PAR assets suffered damage for a storm that would have been covered by insurance.  Additionally, PAR was damaged in that it paid premiums beginning in 2002 for insurance that it did not have."  Document No. 51 at 24.

123.    The matters raised in the 2007 Complaint for this count — ignoring the operation of PAR, failing to collect proper rent and/or failing to prevent Stoney's and Stone from diverting PAR funds and assets — are matters which Nichols suspected or had notice at the time he filed the 2000 lawsuit or definitely by the time he filed the 2003 lawsuit.

124.    "If the confiding party . . . has actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or is in possession of facts which

41

put such a party upon inquiry which would disclose such an abuse, then the applicable statute of limitations begins to run at the time of receiving actual knowledge or of facts placing the confiding party upon inquiry[.]" *Frederick Road Ltd. P'ship*, 360 Md. at 101, 756 A.2d at 976.

125.    The  matters raised in the 2007 Complaint for this count are barred by the statute of limitations.

126.    Nichols has demonstrated (and Stone has conceded) that Stone and BIYC failed to disclose a material fact, *i.e.*, that PAR was paying insurance premiums yearly for a policy which did not name PAR as the insured.  It is undisputed that PAR was not a named insured until 2009.

127.    Nichols has proven by clear and convincing evidence that Stone and BIYC falsely represented that PAR was the insured on the insurance policy.

128.    The falsity of Stone's and BIYC's representation was made with reckless indifference.

129.    By naming Stone, Jeannie Stone and/or Stoney's Seafood House as the insured on the insurance policy, especially in light of Stone's and BIYC's awareness that PAR owned the property, the Court infers from Stone's and BIYC's conduct an intention that Nichols would act in reliance on Stone's and BIYC's representation that PAR was the insured on the insurance policy.  *See Fuller v. Horvath*, 42 Md. App. 671, 685, 402 A.2d 134, 142 (1979) ("Although fraudulent intent is a necessary element, a legal inference of fraud is permissible from the conduct of the parties without regard to their intent.") (citation omitted).

130.    Nichols relied on Stone's and BIYC's representation that PAR was insured and had a right to rely on Stone's representation since Stone, as the managing member of BIYC (the general partner of PAR), was responsible for managing PAR.

131.    Nichols suffered no damage as a result of Stone's and BIYC's misrepresentation. Insurance was in place from 2002 – 2008 to protect PAR's assets.  While the proper insured was

not listed on the policy, the only time a claim was made — after Hurricane Isabel — for damages to PAR assets, the claim as paid.  It would be a different situation if the insurance carrier rejected a claim because the wrong insured had been named.

132.     Nichols has not proven, by clear and convincing evidence, the damage element of the constructive fraud claim.

133.     Judgment as to Count VII will be entered in favor of Stone and BIYC and against Nichols.

*Count VIII:  Fraudulent Concealment against Stone and BIYC*

134.     In his 2007 Complaint Nichols alleges, despite a duty to inform him of all material facts, Stone and BIYC intentionally concealed material information by providing Nichols false and misleading information concerning the true reasons for PAR's inability to make cash distributions.

135.     Nichols asserts Stone and BIYC had sole knowledge of material facts concerning, among other things, "(1) the adverse effect of expense charges on PAR's ability to make distributions to the Limited Partners; (2) the diminution of available cash flow by excessive operational costs improperly passed on to PAR; and (3) failure of Stone and BIYC to take commercially reasonable steps to remain competitive by seeking more favorable lease arrangements and improving occupancy levels on the property, including the marina slips."  2007 Compl. ¶ 117.

136.     With the conclusion of the bench trial, Nichols now includes, among the matters known exclusively by Stone and BIYC, "the fact that PAR was not properly insured."  Document No. 51 at 26.

137.     Nichols also asserts Stone and BIYC failed to disclose to Nichols "the sewage agreement, the commitment of the marina slips to the restaurant for parking, the numerous zoning violations,

or concerning any plans to expand the facilities." *Id.*

138.    To establish a cause of action for fraudulent concealment, Nichols must demonstrate

> (1) the defendant owed a duty to the plaintiff to disclose a material
> fact; (2) the defendant failed to disclose that fact; (3) the defendant
> intended to defraud or deceive the plaintiff; (4) the plaintiff took
> action in justifiable reliance on the concealment; and (5) the
> plaintiff suffered damages as a result of the defendant's
> concealment.

*Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 389 (2008) (quoting *Lloyd v. GMC*, 397 Md. 108, 138, 916 A.2d 257 (2008) (quoting *Green v. H&R Block*, 355 Md. 488, 525, 735 A.2d 1039 (1999)).

139.    Nichols must prove each element of his fraudulent concealment claim by clear and convincing evidence. *Id.* at 524, 958 A.2d at 389 (citing *Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 97 803 A.2d 512 (2002)).

140.    As a limited partner of PAR and as the managing member of BIYC (the general partner of PAR), Stone owed a duty to Nichols to disclose material facts.  Likewise, as the general partner of PAR, BIYC owed a duty to Nichols to disclose material facts.

141.    Nichols has demonstrated (and Stone has conceded) that Stone and BIYC failed to disclose a material fact, *i.e.*, that PAR was paying insurance premiums yearly for a policy which did not name PAR as the insured.

142.    Regarding the sewage agreement, in February 2004, PAR, acting through Stone, granted to Stone an easement onto PAR's property for the purpose of accepting, treating and processing sewage and affluent.  Stone and BIYC failed to disclose to Nichols this material fact.

143.    Stone and BIYC failed to disclose to Nichols the numerous zoning violations.

144.    Stone and BIYC failed to disclose to Nichols the commitment of the marina slips to Stoney's for parking.

145.    Stone and BIYC failed to disclose to Nichols any plans to expand facilities on Broomes Island.

146.    Nichols has not presented *clear and convincing evidence* that Stone's and BIYC's failures to disclose material facts to Nichols were intended to defraud or deceive Nichols.

147.    Nichols has not demonstrated by *clear and convincing evidence* what actions he took in justifiable reliance based on the fraudulent concealment by Stone and BIYC.

148.    Nichols has failed to demonstrate by *clear and convincing evidence* damages he suffered as a result of Stone's and BIYC's alleged concealments.

149.    The Court concludes, although PAR was not a named insured on the insurance policy, PAR's assets were nonetheless insured.

150.    The sewage agreement did not diminish the value of PAR or burden PAR.  In fact the sewage agreement provides a benefit to PAR by housing a sewage holding tank for PAR's waste on an adjacent property.

151.    Although divisions of Calvert County government brought zoning and/or enforcement actions against PAR, Stone and BIYC have addressed all matters without expense incurred or allocated to either Nichols or PAR.  Nichols fails to demonstrate any damages.

152.    Stone and BIYC committing marina slips to Stoney's parking has not damaged Nichols and/or PAR.  As reflected on Plaintiff's Exhibit 13 (Expenses and Income lists from Stone to Nichols for 2001 – 2008), income from the rental of marina slips was $4,200 in 2003, $4,500 in 2004, $4,500 in 2005, $7,000 in 2006 and $5,000 in 2008.  Stone and Jeannie Stone testified that Broomes Island lacks certain amenities offered by other marinas despite Stone upgrading the marina slips.  Also, after the removal of the Oyster House, the marina is more exposed to winds. The marina slips' exposure to adverse weather conditions made PAR's marina slips less

desirable for long term rental.  Nichols has not presented any evidence demonstrating a great demand for rental of marina slips that were not fulfilled.

153.    Nichols alleges Stone and BIYC fraudulently concealed any plans to expand the facilities on Broomes Island.

154.    As revealed during the four day bench trial, since the formation of PAR, Nichols has essentially been an absentee partner.  Nichols rarely communicated with Stone.  As Defendants note, "[Nichols] has intentionally distanced himself from the operations of the business, ignored the information regularly and specifically provided to him and only contacted his partner through litigation."  Document No. 52 at 13.

155.    "The purpose of the partnership is to acquire, develop, and manage the property known as Broomes Island Marina, including all residential and commercial improvement located thereon." Pl.'s Ex. 2 (November 30, 1995 Contract).  This responsibility rested on the shoulders of Stone and BIYC.

156.    Even if Stone and BIYC withheld plans to expand the facilities of Broomes Island, Nichols has not proven by clear and convincing evidence any intent by Stone and BIYC to defraud or deceive Nichols.

157.    Nichols complains Stone and BIYC concealed "the adverse effect of expense charges on PAR's ability to make distributions to the limited Partners" and "the diminution of available cash flow by excessive operational cost improperly passed on to PAR[.]"  2007 Compl. ¶ 117.

158.    Nichols admits receiving yearly financial statements from Mary Stone, PAR's CPA since 1998 and yearly income and expense reports from Jeannie Stone since 2001.  Based on these documents, Nichols knew or should have known about "excessive operational cost improperly charged to PAR" and thus "the adverse effect of these expenses on PAR's ability to make

distributions to the limited Partners." *Id.*

159.    A confidential relationship does not give a confiding party the right to relax his or her diligence "if the confiding party acquires actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or comes into possession of facts which put him or her upon inquiry notice, which, if pursued, would have disclosed the abuse.  In that event, the applicable statute of limitations runs from the time the confiding party receives actual knowledge or the facts which placed him or her upon inquiry notice."  *Frederick Road Ltd. P'ship*, 360 Md. at 99-100, 765 A.2d at 976.

160.    Nichols' claim regarding improperly charged expenses and adverse effects on distributions are barred by the statute of limitations.

161.    Nichols' other claims of fraudulent concealment — the sewage agreement, commitment of marina slips to Stoney's for parking, numerous zoning violations and plans to expand the facilities at Broomes Island — have not been proven by clear and convincing evidence.

162.    Judgment as to Count VIII will be entered in favor of Stone and BIYC and against Nichols.

*Count IX:  Preliminary and Permanent Injunction against Stone*

163.    At the outset of the litigation a preliminary injunction was not imposed by the Court. Nichols' remaining request is for a permanent injunction against Stone.

164.    Nichols seeks a permanent injunction on multiple grounds.

165.    "Stone failed to negotiate and enforce a fair and equitable lease with Stoney's and that Stone failed to develop additional rent producing elements on the property, including a second rent producing restaurant, yet he eliminated numerous other rent producing residential rental units to make way for parking for Stoney's."  Document No. 51 at 27-28.

166.    "Stone failed to follow any corporate formalities in conducting the business of the general partner, including holding any meetings of shareholders, elections, and made major investment and business decisions without consulting other shareholders or partners.  Stone made significant decisions concerning investment of partnership assets without a single meeting or conference with the only other partner, which has resulted in the conversion of what was originally a profitable multi-use complex to a nearly single-use complex that has never earned a profit." *Id.* at 28.

167.    "Stone used his position of trust as the General Partner to spend nearly one million dollars of PAR equity on improvements to the restaurant and other portions of the property without increasing the rent charged to Stoney's and without securing significant increases on residential or marina rental income." *Id.*

168.    "Despite three lawsuits involving the propriety of PAR books and records, Stone steadfastly refuses to maintain separate and proper business records for PAR, including bank accounts, and has continually comingled PAR funds with funds of other entities that he owns or controls." *Id.*

169.    "Stone used his position as General Partner to convert partnership assets to his own use without paying rent, including boat slips in the PAR marina by converting 29 slips to parking spaces to support his expansion of the restaurant." *Id.* at 29.

170.    "Stone has utilized PAR assets to support the development of his adjacent property, including marketing PAR property as a Bed and Breakfast for customers of the adjacent property. . . . Moreover, the property has been developed and maintained as a seamless and contiguous part of the Stoney's restaurant operations and could have served as another source of rent and potential capital investment for PAR, in accordance with its business purpose." *Id.*

48

171.    Nichols does not want the Court to order a dissolution of the partnership because a dissolution would frustrate Nichols' expectations, namely, the Broomes Island property would earn at least what it did in 1995 when Nichols owned it.  A Court ordered dissolution is not desirable in light of the property's diminished values in today's market.  Further a Court ordered dissolution would not resolve the improper capital account balances presently listed on PAR's books.

172.    Nichols argues this Court has equitable powers to appoint a receiver to manage the affairs of PAR but Nichols seeks a less drastic relief.

173.    Nichols requests the Court remove Stone as president or managing member of BIYC.

174.    Nichols requests an independent, business-minded individual, mutually agreed to by Nichols and Stone, be hired and retained as president of BIYC.

175.    Nichols additionally requests an accountant for PAR be retained.  Nichols and Stone must mutually agree to the hiring and retention of the accountant.

176.    Nichols further requests all individuals or entities currently retained or employed by PAR who are related to either limited partner, specifically, Mary Stone and Jeannie Stone, be dismissed unless the limited partners agree otherwise.

177.    If the limited partners cannot mutually agree upon the selection of the president of BIYC and the selection of an accountant for PAR, Nichols suggests the Court order the parties to binding arbitration.

178.    Finally, Nichols requests the Court order a new lease be drafted and executed for Stoney's Seafood House.

179.    Based on four days of testimony the Court concludes the creation of PAR and the operation of PAR have neither been smooth nor always in compliance with governing

documents.

180.   Communication between the limited partners is extremely poor.   "[Nichols] has intentionally distanced himself from the operations of the business, ignored the information regularly and specifically provided to him and only contacted his partner through litigation." Document No. 52 at 13.

181.   Nichols has sued Stone three times:  2000, 2003 and 2007.  Hostility has developed with each successive lawsuit.

182.   The 2000 lawsuit was settled by a Magistrate Judge.   The parties, each assisted by counsel, reached an agreement and executed a new lease in January of 2001.  As part of the agreement settling the 2000 lawsuit Stone granted to Nichols "an irrevocable option to purchase [Stone's] full interest in PAR LIMITED PARTNERSHIP and BROOMES ISLAND YACHT CLUB, INC. for the sum of $1,200,000.00 provided that said option is exercised no later than October 31, 2001."  Pl.'s Ex. 10.

183.   Coincidentally the January 2001 lease, by its own terms, was effective for a ten-month period ending on October 31, 2001.  Pl.'s Ex. 11.  There may have been an expectation that Nichols would purchase Stone's interest by October 31, 2001.  If so, that never happened.

184.   In 2003 Nichols sued Stone and PAR.  Later that same year the parties agreed to voluntarily dismiss the lawsuit without prejudice.  Each party was represented by counsel.

185.   Despite the voluntary dismissal, issues continued to smolder below the surface for Nichols.

186.   Given the bad blood that presently exists between the limited partners and considering the two previous lawsuits did not resolve all issues to the satisfaction of at least Nichols, the Court does not believe allowing the limited partners to resolve the most recent lawsuit, without a

detached, neutral and independent mediator, would be fruitful.

187.    The Court declines, *at this time*, to order Stone's removal as President of BIYC.  Stone and Jeannie Stone are the only persons familiar with the day-to-day operations of PAR's property and are familiar with the intricacies of PAR's business.  *See Lust v. Kolbe*, 31 Md. App. 483, 491, 356 A.2d 592, 598 (1976).

188.    As revealed during the four day bench trial, Stone (and those working on his behalf) failed to maintain separate books for PAR.  Stone (and those working on his behalf) did not have a separate bank account for PAR.  Stone (and those working on his behalf) co-mingled PAR funds with other entities owned or controlled by Stone.  These actions are classic missteps in managing the financial affairs of a partnership.

189.    The crux of Nichols' complaint is financial.  As an alternative to dissolution of PAR, the Court concludes the most appropriate action is the appointment of a *special fiscal agent* who will report to the Court regarding the continued operation of PAR, as a protection to Nichols, the minority limited partner.  This Court will retain jurisdiction of this case.  *See Edenbaum v. Schwarcz-Osztreicherne*, 165 Md. App. 233, 260, 885 A.2d 365, 380 (2005).

190.    The Court directs Nichols and Stone to submit the name of an independent, business-minded individual, mutually agreed to by Nichols and Stone, to act as the *special fiscal agent*.

191.    The problems with PAR are not solely financial; they are also operational.  If PAR continues to exist, a new lease must be executed.  By its own terms the June 28, 1995 lease was effective for two years only.  When the parties executed a new lease in January of 2001, which by its own terms was effective until October 31, 2001, the parties incorporated the *expired* June 28, 1995 lease to the extent it was not superseded by the January 2001 lease.

192.    The problems of PAR are also structural.  Pursuant to the terms of the November 30,

1995 Contract between Nichols, Stone and BIYC, settlement was to occur within 15 days of the full ratification of the contract or within 15 days of the full ratification of a partnership agreement, whichever was later, *otherwise the transaction shall be abandoned*.  Pl.'s Ex. 2 at 2. The contract was ratified on November 30, 1995.  *Id.*  The Limited Partnership Agreement was ratified on November 30, 1995.  *See* Pl.'s Ex. 3.   Settlement however did not occur until December 20, 1995, more than 15 days later.  Contrary to the November 30, 1995 contract, the transaction was not abandoned.

193.    Other structural problems concern the initial capital contributions of the partners.  It was envisioned, at the formation of PAR, that each partner's initial contribution would be $750,000. Stone was supposed to convey $750,000 to Nichols and Broomes Island Marina property would be conveyed to PAR.  The conveyance of the property to PAR would be free of debt other than what Stone guaranteed in connection with obtaining financing.   At the December 20, 1995 settlement the Broomes Island property was valued at $1,030,055, not $1,500,000 as Nichols projected.   Nichols sold the Broomes Island property which was conveyed to PAR as the borrower with a $750,000 loan.  At the time of settlement Nichols received a statement listing his capital contribution as **$280,055**, not $750,000.  Nichols was aware of this discrepancy the day of settlement.  He raised objections that $280,055 did not comport with the November 30, 1995 contract between Nichols, Stone and BIYC.   Nichols' objections were not resolved.   As Defendants note "it has been consistently reported to the IRS since 1996 that Nichols had a capital gain on the sale [of Broomes Island Marina] consistent with the sale price of $1,030,055.00, not $1,500,000.00.  Since 1996, Nichols' capital account has been reported to the IRS on his K-1's."  Document No. 52 at 9.

194.    The problems with PAR are more fundamental.    The limited partners do not

communicate.   Nichols has been virtually absent from PAR.   He rarely visits the property. Nichols has not spoken directly with Stone since a year or two after the formation of the partnership.  Nichols communicates only through lawsuits.

195.    Nichols objects to the triple roles Stone has, specifically, (a) a tenant of PAR (as the owner of Stoney's), (b) a limited partner of PAR and (c) the President of PAR by acting as the manager of the general partner, BIYC.  Nichols asserts Stone's role as managing member of BIYC is contrary to the Limited Partnership Agreement.  Paragraph 12.1 states "[n]o limited partner, in addition to the exercise of his rights and powers as a limited partner, shall take part in the control of the business of the Partnership."  Nichols concedes however that he consented to this arrangement.  Paragraph 10.1 of the Limited Partnership Agreement states "[t]he general partner shall have sole and complete control of the management and operation of the affairs and business of the Partnership and shall operate the Partnership for the benefit of all the partners." There are inherent conflicts between Stone as the owner of Stoney's and PAR, the landlord of Stoney's, while Stone, through BIYC, has sole and complete control of the management and operation of PAR.  The Court notes Nichols was represented by counsel when he agreed to Stone's triple roles.

196.    Presently Mary Stone serves as PAR's CPA and Jeannie Stone as PAR's day-to-day manager.  Neither individual will be removed from her position.  For the record, although Mary Stone is the sister-in-law of Stone, Jeannie Stone is *not* related to Stone.

197.    The Court awaits the report of the special fiscal agent.

198.    Nichols's request for a permanent injunction is hereby **HELD IN ABEYACE**.

*Count X:  Accounting*

199.    At the beginning of the bench trial Nichols moved to amend his complaint with a request

that PAR books and records be amended to account for his initial contribution to the partnership as listed in the Limited Partnership Agreement of November 30, 1995.  According to the Limited Partnership Agreement Nichols and Stone each initially contributed $750,000 to the partnership.

200.    Stone opposed the belated amendment to the complaint.  Considering the liberal rules for amending complaints, the Court permitted the amendment.

201.    According to the Limited Partnership Agreement, the Broomes Island Marina property was to be conveyed *free of debt* to the partnership upon *payment of $750,000 by Stone to Nichols.*  However on December 20, 1995 Nichols *sold* the Broomes Island Marina property to PAR Limited Partnership for $1,030,055.  Instead of receiving the property free of debt PAR Limited Partnership received the property with a $750,000 loan secured by a deed of trust which Stone verbally agreed to pay.

202.    At the December 20, 1995 settlement Nichols received paperwork indicating his contribution to the partnership (after selling the property whereby two mortgages totaling $428,930.42 owed by Nichols were satisfied) was $280,055 (including an adjustment of settlement costs).  Nichols also received $295,828.80 in cash.  At settlement Nichols raised objections to the partnership contribution of $280,055 since it did not comport with the terms of the November 30, 1995 contract listing Nichols' partnership contribution as $750,000.  Nichols' objections concerning the settlement statement were not resolved.

203.    In late 1998 Nichols received prepared statements of assets, liabilities and partner's capital – income tax basis of PAR as of December 31, 1996 and 1997.  The statements were prepared by Mary Stone.  Mary Stone identified Nichols' 1996 capital account as $293,423 and his 1997 capital account as $313,556.

204.    Upon reviewing the statements Nichols called Mary Stone and questioned her

computation of Partners' Capital Accounts numbers.  Nichols believed his 1996 capital account should have been at least $780,000 ($750,000 as the initial capital contribution and $30,000 in deferred rental payments from Stoney's).

205.   Nichols knew, as of December 20, 1995, that the capital contribution on the settlement sheet did not comport with the terms of the Limited Partnership Agreement.  This discrepancy was confirmed upon receipt of PAR financial statements prepared by Mary Stone.  Nichols' claim for a review of the handling of the initial transaction in 1995 is barred by the statute of limitations.

206.   Considering the co-mingling of PAR's funds with other entities owned or operated by Stone as well as the yearly report of income and expenses prepared by Jeannie Stone which lacked sufficient detail, an accounting is not only appropriate but necessary.

207.   Limitations bar any accounting earlier than December 19, 2004.  PAR's fiscal year runs from January 1 through December 31 each year.  For ease of administration, the accounting will begin on January 1, 2005.

208.   This accounting is separate and apart from the duties of the *special fiscal agent*.

209.   The Court directs Nichols and Stone to submit the name of an accountant who has had no involvement with this case as a nominee individuals to conduct the accounting.  The parties must agree on the nominee.  The name must be accompanied by a curriculum vitae.

210.   If the parties cannot agree on an accountant to conduct the accounting, the Court will select an accountant.

211.   The cost of the accounting will be split evenly between Nichols and Stone.  All or a portion of the costs will have to be deposited with the registry of the Court.

212.   As to Count X judgment will be entered in favor of Nichols and against Stone, Stoney's

and BIYC.

213.    The Court notes that this action has been brought as a derivative suit.  "Before bringing a

derivative suit in Maryland. . . , the shareholder must either make a demand on the board of

directors that the corporation bring the suit, or  show that demand is futile."  *Mona v. Mona*

*Electric Group, Inc.*, 176 Md. App. 672, 699, 934 A.2d 450, 465-66 (2007 (citing *Bender v.*

*Schwartz*, 172 Md. App., 648, 666, 917 A.2d 142 (2007).  No demand was ever made.

214.    There is a similar requirement when maintaining a derivative action against a partnership.

"In a derivative action, the complaint shall set forth with particularity the attempts, if any, of the

plaintiff to secure initiation of the action the plaintiff desires by a general partner or the reasons

for not making the effort."  MD. CODE ANN., CORPS. & ASS'NS § 10-1003 (LEXIS NEXIS 1975,

2007 REPL. VOL.).  The Complaint does not contain this information.


  March 31, 2010               _____/s/_____
        Date                              WILLIAM CONNELLY
                                    UNITED STATES MAGISTRATE JUDGE