## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ROBERT L. NICHOLS** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. WGC-07-3389** |
| | ) |
| **LOUIS P. STONE, III,** *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OPINION

In the Order of March 31, 2010 (Document No. 54), the Court entered judgment as to Counts I – VIII of the Complaint in favor of Defendants and against Plaintiff, entered judgment as to Count X of the Complaint in favor of Plaintiff and against Defendants, and held in abeyance judgment as to Count IX (Preliminary and Permanent Injunction against [Louis P.] Stone [III]).  In the Order of August 12, 2010 (Document No. 63), the Court approved the selection of Regis A. Johnston, Esquire, as the special fiscal agent, and Martha Rymer, CPA, as the accountant, to perform the duties set forth in the Court's Memorandum Opinion of March 31, 2010 (Document No. 53 ¶¶ 188 – 190, 197, 209 – 211).

The Court received Ms. Rymer's accounting report dated February 4, 2011.  The Court thereafter provided copies of that report to Mr. Nichols (*pro se*) and Ms. Palmer, counsel for Defendants.  In the letter of February 24, 2011 Ms. Palmer, on behalf of her clients, identified two issues with respect to Ms. Rymer's report.  In an e-mail of March 9, 2011 Mr. Nichols responded to Ms. Palmer's February 24, 2011 letter.

The Court received a February 28, 2011 interim report, a June 8, 2011 final report and a June 24, 2011 letter with attachments from Mr. Johnston, the special fiscal agent.  Having

received the required reports, on July 7, 2011 the Court scheduled a motions hearing for August 29, 2011. *See* Document No. 67. The Court permitted any party to file objections or challenges to Ms. Rymer's report and/or Mr. Johnston's reports by August 12, 2011. The parties filed responses to the reports. *See* Document Nos. 68-69. On August 29, 2011 the Court heard arguments of the parties. In light of the parties' written responses and oral arguments, the Court addresses the challenges and/or objections to the reports.

<u>*Ms. Rymer's Accounting Report*</u>:

Mr. Nichols has not raised any issues concerning Ms. Rymer's report. Mr. Nichols characterizes Ms. Rymer's report as consistent with his trial expert.

Defendants Broomes Island Yacht Club, Inc. ("BIYC"), the General Partner of PAR, Louis P. Stone, III ("Mr. Stone") and Stoney's Seafood House, Inc. ("Stoney's") (collectively "Defendants") raise two issues with respect to Ms. Rymer's report. Defendants assert Ms. Rymer improperly allocated all expenses associated with the reconstruction after Hurricane Isabel in the Fall of 2003 to Stoney's. Defendants claim the reconstruction expenses were and should properly be borne by the partnership, PAR Limited Partnership ("PAR"). With a corrected allocation of such expenses, Mr. Stone's capital account balance should be readjusted to $1,006,585.00. Second, Defendants claim Ms. Rymer improperly reclassified all expenses of PAR property as the responsibility of Stoney's.

A.      *Hurricane Damage Expenses*

In her February 4, 2011 report to the Court, under "Findings," Ms. Rymer wrote, "[i]n our review of the lease agreement, dated June 28th 1995, we interpreted the document to read that . . . if the tenant makes any improvements or alterations, the tenant will make those improvements at its own expense." Report from Rymer, CPA to Judge Connelly of 2/4/11 at 3.

In accordance with this finding, Ms. Rymer reclassified *all improvements* as the obligation of the Tenant, Stoney's. *Id.*

In support of their argument that Ms. Rymer's misallocated reconstruction expenses attributable to Hurricane Isabel damage, Defendants direct the Court's attention to Paragraphs 14 and 15 of the 1995 Lease which state,

> 14.    In case of the total destruction of said premises[1] by fire, the elements or other cause, or of such damage thereto as shall render the same totally unfit for occupancy by the Tenant, this Lease, upon surrender and delivery to the Landlord of the said premises, together with the payment of the rent then due and a proportionate part thereof to the date of surrender, shall terminate and be at an end.

> 15.    If any cause mentioned in Paragraph 14 shall render the leased premises partly untenantable, the Landlord shall, at its own expense, restore said premises with all reasonable diligence and the rent shall be abated proportionately for the period of untenantability and the part of the premises untenantable until said improvements shall have been fully restored, provided, that if neither said premises nor any part therefor shall be rendered either wholly or partly untenantable, the Landlord shall, at its own expense, restore the premises with all reasonable diligence, but the rent shall not be abated to any extent whatsoever.

Pl.'s Trial Ex. 9.  Pursuant to the 1995 Lease, Stoney's is the Tenant and Broomes Island Marina, (subsequently BIYC, the General Partner of PAR) is the Landlord.

Based on testimony presented during the four day bench trial in August of 2009, it is undisputed that the premises were ***not*** totally destroyed and therefore Paragraph 14 is not controlling.  In the Memorandum Opinion of March 31, 2010, under "Findings of Fact" the Court found in pertinent part, "In September 2003 Hurricane Isabel caused significant damage to

---

[1]  The June 28, 1995 lease defines the "premises" in paragraph 7 as follows:  "(A) Stoney's Restaurant at 3938 Oyster House Road, Broomes Island, Maryland.  (B) Apartments A & B (top and bottom) of house at 3946 Oyster House Road, Broomes Island, Maryland.  (C) Former Marina Office at 3942 Oyster House Road, Broomes Island, Maryland.  (D) House at 3939 Oyster House Road, Broomes Island, Maryland, exclusive of the bath and shower facilities at the rear of the building.  (E) Slips No. 8-15 at the Broomes Island Marina."  Pl.'s Trial Ex. 9 at 1-3.

the PAR property on Broomes Island. . .The damage caused by Hurricane Isabel was repaired by Stone and the facilities were significantly improved and enlarged." Document No. 53 at 11 (¶ 22). In the discussion regarding Count IV, Tortious Interference with Prospective Advantage against Stone and BIYC, under "Conclusions of Law", the Court noted, "It is undisputed that after Hurricane Isabel severely damaged PAR property on Broomes Island, Stone repaired the property. The facilities on Broomes Island were significantly improved and enlarged." *Id.* at 30 (¶ 61). Because the premises were not totally destroyed, the Court turns to Paragraph 15.

According to Paragraph 15, if a cause mentioned in Paragraph 14 (fire, elements or other cause) renders the leased premises partly untenantable, the Landlord, *i.e.,* PAR, at its own expense, shall restore the premises with all reasonable diligence. While the premises are partly untenantable, rent is abated proportionately for the period of untenantability.

During the four day bench trial evidence was presented that, despite the untenantability of Stoney's, the rent was not abated and thus PAR, as the Landlord, continued to receive rent. That testimony was substantiated by the following memorandum from Mr. Stone to Mr. Nichols regarding PAR's 2003 Income and Profit. The relevant portion of the memorandum states,

> As you are well aware Broomes Island was hit relatively hard by the hurricane and thus suffered substantial damage, some of which was not covered under insurance since it was flooding. Stoney's was forced to close for the season, 1 ½ month earlier, as a result of the damage. Please note that all rent for Stoney's was credited in full even though all operations had stopped.

Pl.'s Trial Ex. 13 at 6 (PAR Lmtd. 2003 Income and Profit).

Stoney's operates six months a year. According to Jeannie Stone's trial testimony, as a result of Hurricane Isabel, the building for Stoney's could not be occupied and thus the building could not be used as a restaurant. Jeannie Stone asserted the building had to be totally redone.

With regard to specific damage resulting from Hurricane Isabel, Jeannie Stone testified

that the flooring on the porch of the restaurant building had to be replaced.  At another point during her testimony Jeannie Stone stated there was no floor at Stoney's after the hurricane and thus the floor had to be replaced.  Also, Jeannie Stone testified that the roof of the main building (Stoney's) was totally torn off in parts and there were no windows left.  The two outbuildings were totally damaged, as noted by both Jeannie Stone and Mary Stone.

Jeannie Stone took photographs of PAR property after the hurricane.  Defendants' Trial Exhibit 23a is a photograph showing a view of the lower deck area over the water in front of the tikki bar which was obliterated.  The small pier area was totally wiped out as well as the area for outside seating.  Defendants' Trial Exhibit 23e is a photograph depicting the devastated lower decks and two outbuildings.

Jeannie Stone also took multiple photographs of Broomes Island during the Winter of 2007-2008.  Defendants' Trial Exhibit 6f depicts the front of the main dining room, connected to the older building (defined by the door and two sliding glass door windows).  This older building housing Stoney's restaurant has been re-sited or relocated since it was originally constructed. There was major renovation done to the older part of the structure, *i.e.*, the older building. Defendants' Trial Exhibit 6h is very similar to Defendants' Trial Exhibit 6f and shows the front entrance of the new restaurant facing the water as well as the old building.  Defendants' Trial Exhibit 6i shows two old buildings that have been refurbished.  Defendants' Trial Exhibit 6l shows the opposite side of the existing old restaurant, from a vantage point across the way on the long pier, looking at the restaurant as it sits above the water and on the dock.  Defendants' Trial Exhibit 6m shows the back side of the original restaurant.  Defendants' Trial Exhibit 6n shows the side view of the original restaurant.  The original restaurant has been refurbished and re-shingled so it looks rather new.  Defendants' Trial Exhibit 6o shows the back side of the original

restaurant.  Defendants' Trial Exhibit 6p shows the other side (or opposite viewpoint compared to Defendants' Trial Exhibit 6f) of the back side of the original restaurant, showing the restaurant sitting all over the water.  From this viewpoint one is looking at the short pier.  Defendants' Trial Exhibit 6p is taken from the same vantage point as Defendants' Trial Exhibit 6l.

Part of the new construction post-Hurricane Isabel is the new bathroom built for women as seen in Defendants' Trial Exhibit 6q.  Pre-Hurricane Isabel there was one, unisex restroom. Defendants' Trial Exhibit 6r depicts the lower deck over the water, outside seating, which was rebuilt after Hurricane Isabel.  Defendants' Trial Exhibit 6u depicts the tikki bar, the lower deck area and the upper deck area adjacent to the tikki bar.  Defendants' Trial Exhibit 6y shows the additional deck with the new kitchen.  Defendants' Trial Exhibit 6c, the very far left, shows the beginning of the main building and the new restaurant's dining room (has a Stoney's sign on it and air conditioning units adjacent to the building).  Defendants' Trial Exhibit 6d shows the side view of the main dining room (new restaurant).

Defendants' Trial Exhibits 8a and 8b show both the long pier and the short pier. Defendants' Trial Exhibits 8c through 8d show the long pier.  These photographs were taken by Jeannie Stone during the Winter of 2007–2008.  The short pier was destroyed by Hurricane Isabel and was rebuilt.

As noted in the March 31, 2010 Memorandum Opinion, under the partnership agreement Mr. Stone has multiple responsibilities.  "Stone is a tenant of PAR (as owner of Stoney's), a limited partner of PAR, and the managing member of BIYC, the general partner of PAR. Nichols consented to this arrangement."  Document No. 53 ¶ 10.  Because Mr. Nichols was an absentee partner, Mr. Stone was making all of the decisions on behalf of PAR.  During the four day bench trial uncontroverted evidence was presented that Mr. Stone paid to rebuild Stoney's

building, as well as other facilities damaged or destroyed by Hurricane Isabel without any contribution by Mr. Nichols.

During the third day of the bench trial, August 27, 2009, Mr. Nichols' counsel questioned Jeannie Stone about the costs of rebuilding after Hurricane Isabel.  The following colloquy occurred.

> Q:      Wasn't there an investment of $200,000 or so to repair the . . .
>
> A:      We rebuilt it back so it would be better and so we wouldn't have these problems again if the storm did arise.  We raised it up above the flood line elevation.
>
> Q:      So a large portion of that is improvement to the property in terms of, hoping that it is not subject to the same kind of flooding in the future?
>
> A:      Wouldn't you rather protect your property in that way rather than replace it with what was there that's going to get washed away again?
>
> Q:      Well I'm asking . . .
>
> A:      That's why I am saying that was a decision to be made; it's definitely a leasehold improvement to the property, to both partners.
>
> Q:      And those improvements were charged against the, they were charged to PAR, were they not?
>
> A:      Right.
>
> Q:      There's an entry in Mr. Stone's capital account which ultimately comes out of the PAR, the PAR property?
>
> A:      Correct.  It increased the value of PAR by doing it that way.

August 27, 2009 (12:40:59 – 12:41:57).[2]

---

[2] Neither side requested a transcript of the four day bench trial.  The Court therefore uses as a citation the recording of time as listed on *FTR Gold*, the Court's digital recording system.

As revealed during the course of the four day bench trial, the expenses for repairing and improving after Hurricane Isabel occurred in 2004 but were not recorded until 2007.  Plaintiff's counsel questioned Mary Stone of Mullen, Sondberg, Wimbish & Stone, P.A., the accountant for Mr. Stone, Stoney's and PAR, regarding the unusual delay in recording the capital improvements.

> Q:     Were you being directed by management to put these costs [$324,749 from 2004] on the PAR schedule?
>
> A:     Well, what happened was [Jeannie Stone] had forgotten with rebuilding the restaurant that all these, not rebuilding the restaurant but the additional new structures because this was new structure costs, that had gone on Broomes Island improvements. And so she said, oh heck, you know, I forgot that that really, to tell you that was PAR.  So she actually instructed us to do, to put it on PAR.
>
> Q:     Okay.  And when, do you remember when this occurred?
>
> A:     I think 2007, by 2007, 2008, 2008, maybe 2007.
>
> Q:     Okay.  At some point in 2007 or 2008, you are instructed to put this series of 2004 costs onto the PAR schedule.
>
> A:     That's correct.
>
> Q:     Do you know if they were all put on as improvements or would they have been allocated to improvements or repairs?
>
> A:     No, they were all improvements.  I actually went back and looked at our records on this.  They were on Stoney's books and broken down pretty detailed.  So, that amount was there and did exist.  The actual expenses did exist.
>
> *                              *                              *
>
> A:     I did pull a tax return schedule off of Stoney's Broomes Island that shows the numbers.  Because I think there is confusion that some of Oyster House[3] might be commingled and it is not. 'Cause based on what was filed with the tax return, I did add up, it was $323,216.  And hers, it was close.

---

[3] Property individually owned by Mr. Stone, located on land (Warren Denton property) adjacent to PAR property.

> Jeannie went and gave me stuff that she found after the fact. But we had produced this back in 2004 on the actual records of the improvements. So that was sitting on the tax return. So it was the correct amount. And then there was [sic] some Oyster House expenses. 'Cause I think there's confusion whether Oyster, Oyster House is separate. We keep those separate.

August 27, 2009 (4:16:45 – 4:17:59, 4:18:18 – 4:19:05).

During the August 29, 2011 hearing counsel for Defendants asserted that Mr. Nichols' own accounting expert, Philip R. Baker, did not challenge the allocations of these expenses as capital improvements during the bench trial. Counsel for Defendants cites Mr. Baker's "acceptance" of the capital improvements allocation in contending that Ms. Rymer's lack of understanding about the facts and circumstances of the capital improvements resulted in Ms. Rymer's February 4, 2011 recommendation that those expenses be reallocated against Mr. Stone's capital account.

The Court has reviewed Mr. Baker's testimony. The recollection of Mr. Baker's opinion by Defendants' counsel is inconsistent with Mr. Baker's testimony. The following colloquy occurred between Mr. Baker and counsel for Defendants.

> Q:     You agree that there should be no reallocation of the building improvements, right? That was not a line item you made any adjustments to.
>
> A:     I was not asked to go back through the building improvements and make any comments regarding it. I did not have invoices of what all that documented. . .
>
> Q:     But that's accepted.
>
> A:     It was not in what I was asked to do.
>
> Q:     By the definition of the instructions given to you, the building improvement line is accepted?
>
> A:     There was no acceptance or non-acceptance. I was not

> asked to go and reallocate building improvements — whether they
> were building improvements or expenses — because I had no
> invoices to look at and no documents to look at that would tell me
> what the building improvements were.
>
> Q:      I understand that.  I'm just saying, from the marching
> orders given to you, building improvements are accepted, yes or
> no?
>
> A:      Not accepted.  They were not in the realm of what I was
> asked to do.

August 27, 2009 (10:20:43 - 10:21:55).

On direct examination Mr. Baker noted the capital improvements occurred in 2004, as

noted on the depreciation schedule, but were recorded for the first time in 2007.  Mr. Baker

characterized this as "a little odd."  He explained the normal accounting practice is that one

records the improvements in the year they are incurred.

Should the capital improvements in 2003-2004, post-Hurricane Isabel, be borne by the

partnership PAR?  The Court begins its analysis by reviewing the Lease of June 28, 1995.

According to the 1995 Lease, any improvements to the premises is a financial burden of

the Tenant as outlined in Paragraph 9 which states in pertinent part,

> That the Tenant will not make any alterations to said premises
> without the written consent of the Landlord.  If the Tenant shall
> desire to make any such alterations, the same shall first be
> submitted to and approved by the Landlord, and shall be done by
> the Tenant at its own expense, and the Tenant agrees that all such
> work shall be done in a good and workmanlike manner, that the
> structural integrity of the building shall not be impaired, and that
> liens shall attach to the premises by reason thereof.

Pl.'s Trial Ex. 9.

Based on the evidence of record, it is without question that some of the capital

improvements, resulting from the damage caused by Hurricane Isabel, **restored** the premises as

they existed **pre**-Hurricane Isabel.  These capital improvements were essentially replacements.

It is further without question that some of the capital improvements, such as the restaurant, constituted significant enhancements to the property.  Paragraph 15 of the 1995 Lease clearly places the financial responsibility for restoring the premises on the Landlord, *i.e.,* PAR.  But how does the 1995 Lease treat repairs or replacements that do not merely restore destroyed or untenantable premises, but significantly enhances the original premises?

After reviewing the 1995 Lease, the Court finds no provision which specifically addresses this scenario.   Nevertheless the Court finds Paragraph 15 explicitly limits the Landlord's financial responsibility to **restoring** any damaged or destroyed premise that is wholly or partially untenantable.  Paragraph 15 states in pertinent part, "*the Landlord shall, at its own expense, restore said premises with all reasonable diligence and the rent shall be abated proportionately for the period of untenantability and the part of the premises untenantable until said improvements shall have been fully restored*[.]"  Pl.'s Trial Ex. 9 (emphasis added).

By using the word *restore* the Court finds the Landlord intended and the Tenant agreed that the Landlord shall be responsible for returning the premises to the conditions which existed before any destruction or damage by fire, the elements or other cause.  According to *Webster's New Universal Unabridged Dictionary*, the word *restore* has *six* definitions.  The Court finds the first two definitions are pertinent to the 1995 Lease:  "**1.** to bring back into existence, use, or the like; reestablish: *to restore order.*  **2.** to bring back to a former, original, or normal condition, as a building, statute or painting."  *Webster's New Universal Unabridged Dictionary* 1641 (1996).  Because the significant improvement and expansion of the building housing Stoney's restaurant is beyond a mere restoration, the Court finds the Tenant, *i.e.*, Stoney's, is financial responsible for the expenses associated with this improvement and enlargement.   Paragraph 9 clearly imposes on the Tenant the expense for any alteration to the premises.

The Court is well aware that Mr. Stone wore multiple hats, namely, as a tenant of PAR (as owner of Stoney's), a limited partner of PAR, and the managing member of BIYC, the general partner of PAR.  The interests of these three entities did not always coincide.  As Mr. Stone failed to maintain a separate bank account and financial records for PAR and had PAR funds commingled with Stoney's, likewise Mr. Stone failed to segregate PAR's restoration responsibility of the premises from Stoney's desire to have a significantly larger and improved dining facility and other accommodations.

The Court has reviewed Plaintiff's Trial Exhibit 24, consisting of 33 pages[4] of *Register Quick Report* printouts, purportedly Hurricane Isabel reconstruction costs.  Very few of the entries on the *Register Quick Report* identify the work as "repairs" or "equipment replaced."  The vast majority of the entries are identified as "leasehold improvement."  The Court has also listened to the testimony of Jeannie Stone where Plaintiff's counsel questions Jeannie Stone about the vast majority of the *Register Quick Reports*.

One example of an alteration or capital improvement is the bathroom.  As Jeannie Stone testified, before Hurricane Isabel, there was one facility, a unisex bathroom.  After Hurricane Isabel, Mr. Stone and/or an agent or employee of Mr. Stone, decided to have a new bathroom built for women.  Having separate facilities for men and women is a feature valued by customers.  However the building of a separate bathroom is a capital improvement since it did not exist before Hurricane Isabel.  This expense must be borne by the Tenant.

Another example of an alteration or capital improvement is the elevation of the restaurant about the flood plain.  The Court does not dispute that this decision was prudent from a business perspective, to avoid similar damage in the future.  Nevertheless, by the terms of the 1995 Lease,

---

[4] For two of the *Register Quick Report* printouts, three copies each of these two printouts are part of Plaintiff's Trial Exhibit 24.

PAR, as the Landlord, is financial responsible for *restoring* the restaurant to pre-Hurricane Isabel conditions, not for any improvements. Therefore, the costs associated with elevating the restaurant is a capital improvement or alteration to be borne by the Tenant.

After a careful review of the *Register Quick Reports* (Plaintiff's Trial Exhibit 24), the testimony of Jeannie Stone, the testimony of Mary Stone and the photographs (Defendants' Trial Exhibits 6, 8 and 23), the Court finds more than half of the funds expended after Hurricane Isabel applied to capital improvements or alterations. These expenses are the responsibility of the Tenant solely, consistent with Paragraph 9 of the 1995 Lease. The remaining expenses are attributable to the Landlord, PAR. Numerically, the Court finds **60%** of the expenses are capital improvements and **40%** are for restoration.

For the period ending June 1, 2007 Ms. Rymer identifies **$324,749.00**[5] as improvements. According to Jeannie Stone the total amount Mr. Stone spent after Hurricane Isabel was **$324,790.00**. The Court finds 60% or **$194,849.40** consists of capital improvements and is therefore an obligation of the Tenant (Stoney's). The remaining 40% or **$129,899.60** consists of repair or replacement and is therefore an obligation of the Landlord (PAR). The capital accounts[6] of Mr. Nichols and Mr. Stone must be adjusted accordingly by the accountant for

---

[5] In Defendants' Memorandum Concerning Final Resolution of Counts IX and X of Plaintiff's Complaint, Defendants assert "the expenses that Ms. Rymer assigns as improvements totaling $383,051.00 on the last page of her report are all the reported construction costs that resulted from the devastation caused by Hurricane Isabel." Document No. 68 at 5. This assertion is incorrect. On the last page of her report, concerning improvements, Ms. Rymer lists the following: [a] "Leasehold improvements — 6/1/2007 — $16,866.00", [b] "Improvements — [6/1/2007] — $324,749.00", [c] "Improvements — 6/1/2008 — $18,995.00" and [d] "Improvements — 6/1/2008 — $22,441.00[.]" These four amounts total $383,051.00 which Ms. Rymer labeled as a tenant expense. The alleged total cost of reconstruction after Hurricane Isabel is **$324,749.00** (the second amount listed by Ms. Rymer on the last page of her report and the amount reported as the total reconstruction cost by Jeannie Stone at the bench trial), not $383,051.00.

[6] The Court notes that Ms. Rymer reallocated the capital balance for Mr. Stone, Mr. Nichols and BIYC as of December 31, 2009. "An evaluation of the capital account to date cannot be determined until all expenses of PAR have been accounted for and summarized by the bookkeeper for 2010." Report from Ms. Rymer, CPA to Judge Connelly of 2/4/11 at 1. Because the Court has not adopted Ms. Rymer's reallocation of **all** Hurricane Isabel Reconstruction Expenses of 2007 as the responsibility of the tenant, the accountant for PAR must not rely on Ms.

PAR.

Besides the above adjustment to Mr. Nichols' and Mr. Stone's capital accounts, there are three additional adjustments to these capital accounts that the accountant for PAR must make. First, as a result of Hurricane Isabel, Stoney's closed 1 ½ months early.  Under Paragraph 15 of the 1995 Lease, Stoney's had the right to abate rent *until* the Landlord, PAR, restored the premises.  Stoney's did not abate the rent.  During this period Stoney's paid $6,000.00 per month as rent.  Thus Stoney's should be credited for 1 ½ months of rent or **$9,000.00**.

Second, Stoney's continued to pay rent throughout the Winter/early Spring of 2003 and 2004 while Mr. Stone and his staff oversaw reconstruction at Broomes Island.  In accordance with Paragraph 15, Stoney's had the right to abate rent *until* the Landlord, PAR, restored the premises.  The rent during this six month period was $6,000.00 per month.  Thus Stoney's should be credited for six months of rent or **$36,000.00**.

Finally, to pay for the cost of the services of Ms. Rymer and Mr. Johnston as accountant and special fiscal agent respectively, the Court directed Mr. Nichols, individually, and the Defendants (Mr. Stone, Stoney's and BIYC), jointly, to each deposit $10,000.00 with the Registry of the Court.  Mr. Stone deposited $10,000.00 as ordered; however, Mr. Nichols deposited $5,000.00 only.  The total cost of services for Ms. Rymer and Mr. Johnston was $10,705.41. Mr. Stone has paid more than 50% for the services of Ms. Rymer and Mr. Johnston. The Court intended that the cost of the services be divided *equally* between Plaintiff and Defendants.  By separate Order the Court has directed the Clerk of the Court to disperse from the Registry of the Court the sum of $4,294.59 (plus any interest) to Mr. Stone.  *See* Document No. 72.  To place Mr. Stone and Mr. Nichols on an equal financial footing, the Court directs the accountant for PAR to credit Mr. Stone's capital accountant in the amount of **$352.71**.

Rymer's reallocation but adjust the capital accounts in accordance with this Memorandum Opinion.

*B.*     *Ms. Rymer's reclassification of expenses*

In her February 4, 2011 report Ms. Rymer made the following finding:  "In our review of the lease agreement, dated June 28th 1995, we interpreted the document to read that the tenant, **Stoney's Seafood House, Inc.** was responsible to pay for all fuel, telephone, electricity[,] water and sewer."  Report from Rymer, CPA to Judge Connelly of 2/4/11 at 3.  Accordingly Ms. Rymer reclassified "all utilities, repairs and maintenance [and] insurance . . . as the obligation of the tenant, Stoney's Seafood House, Inc."  *Id.*  Defendants contend Ms. Rymer misinterpreted the 1995 Lease.  Ms. Rymer did not realize that some of the premises were PAR property, and thus the responsibility of PAR, and other premises were the responsibility of the Tenant.

The 1995 Lease states in pertinent part:

> THE  TENANT  COVENANTS  AND  AGREES  WITH  THE LANDLORD AS FOLLOWS:
>
> *                         *                         *
>
> 2.     To use and occupy the leased premises solely in connection with the operation of a restaurant business and related businesses.
>
> *                         *                         *
>
> THE PARTIES HERETO FURTHER COVENANT AND AGREE WITH EACH OTHER AS FOLLOWS:
>
> 7.     The premises being leased consists of the property:
>
> (A)     Stoney's Restaurant at 3938 Oyster House Road, Broomes Island, Maryland.
>
> (B)     Apartments A & B (top and bottom) of house at 3946 Oyster House Road, Broomes Island, Maryland.
>
> (C)     Former Marina Office at 3942 Oyster House Road, Broomes Island, Maryland.
>
> (D)     House at 3939 Oyster House Road, Broomes Island,

> Maryland, exclusive of the bath and shower facilities at the rear of
> the building.

> (E)      Slips No. 8 – 15 at the Broomes Island Marina.

Pl.'s Trial Ex. 9 at 1-3.

Defendants assert "[t]he leased premises . . . never included the new apartments and the new marina.  These remained PAR property."  Letter from Palmer, Esq. to Judge Connelly of 2/24/11 at 2.  Based on the clear and unambiguous language of the 1995 Lease, the premises to be used and occupied by the Tenant, in fact, included the apartments and the marina.  If the parties' course of conduct was contrary to the clear and unambiguous language of the 1995 Lease, this is not surprising in light of the evidence presented during the four day bench trial.  Thus the Court finds, based on the clear and unambiguous language of 1995 Lease, Ms. Rymer's interpretation is correct.

In her report Ms. Rymer made the following findings regarding the 2001 Lease:

> In January 2001 a lease was also signed that did not supersede the
> June 1995 lease but added provisions that stated the tenant would
> be also responsible for septic charges and that the partnership
> would get rental income from the slips and residential properties
> paid to the landlord.

Report from Rymer, CPA to Judge Connelly of 2/4/11 at 3.

Defendants challenge Ms. Rymer's findings concerning the 2001 Lease.

> The 2001 document does not re-define the leased premises.  The
> new apartments and the full new marina are not included as part of
> the leased premises in any documentation.  The 2001 document
> clearly states that the rental income from the marina slips and
> rental properties was to go directly to PAR.  In all respects, the
> new apartments and the new marina were consistently treated as
> outside of the 1995 Lease.

Letter from Palmer, Esq. to Judge Connelly of 2/24/11 at 2.

The 2001 Lease states in pertinent part:

The parties covenant and agree as follows:

1.    The rent for January 2001 shall be due ten (10) days after this Lease is signed.

2.    All rental income from the slips shall be paid to the Landlord.

3.    All rental income from the residential properties shall be paid to the Landlord.

4.    The Tenant shall pay all septic charges.

5.    All terms of a lease made June 28, 1995 between Robert L. Nichols, t/a Broomes Island Marin[a], and Stoney's Seafood House, Inc. t/a Stoney's Seafood, to the extent they are not inconsistent with the above terms, are incorporated herein by reference.

Pl.'s Trial Ex. 11.

If the residential properties and the slips were *always* PAR property, why would the 2001 Lease need to *specify* that all rental income from the slips and from the residential properties shall be paid to the Landlord?  The Court finds Ms. Rymer's findings with regard to the 2001 Lease are accurate.

The Court notes that whether the residential properties and the slips[7] were *always* PAR property or were not classified as PAR property until 2001 is not relevant to the unresolved

---

[7] In support of the Court's reading of the unambiguous language of the 1995 Lease, the lease identified as part of the premises *eight* slips, specifically Slips No. 8 – 15.  In his August 12, 2011 response to the Court about the reports of Ms. Rymer and Mr. Johnston, Mr. Nichols questions why Mr. Johnston's report fails to note that the "[l]eases do not recognize rent to the Partnership for any of the forty-eight (48) boat slips."  Document No. 69 at 1. Furthermore with regard to the June 1, 2011 Commercial Lease Agreement for Stoney's Seafood, Exhibit B, Mr. Nichols claims there is "[n]o justification granting Phil Stone the free use of the remaining eight (8) boat slips.  Boat slips are fully occupied during the boating season, indicating a definite strong market for rental.  The PAR Ltd. Partnership should realize the income." *Id.* at 2.  The June 1, 2011 Commercial Lease Agreement, Exhibit B (Description of Buildings) between PAR Limited Partnership (Landlord) and Stoney's Seafood House, Inc. (Tenant) defines buildings to include "(b) All decks, walkways, piers, boat slips and accessory buildings and structures currently being utilized by Stoney's Seafood House, Inc. in connection with its said restaurant facility.  Specifically this includes the pier and floating dock of the restaurant, *eight slips on the south side of the long pier*, the outdoor bar, detached restroom, outdoor bar and storage building with walk-in boxes."  Letter from Johnston, Esq. to Judge Connelly of 6/24/11, Ex. 4 (emphasis added).  In short, the issue of the slips, whether *all* are PAR property *or* whether eight (8) slips are assigned to Stoney's and the remainder are PAR property remains unresolved.

issues because Ms. Rymer's task was to evaluate the financial records of the PAR Limited Partnership from January 1, 2005 to the present.

The Court agrees with Defendants that since PAR, as the Landlord, receives all rental income, PAR, as the Landlord, is financially responsible for all expenses *except* septic (as noted in the 2001 Lease). "All other costs for the marina and the apartments were treated as outside of the lease and solely as PAR income, and PAR expenditures." Document No. 68 at 8. Defendants acknowledge the septic charges were improperly allocated to PAR. Defendants assert "[a] septic Account Adjustment of $7,860.60 is necessary for both Nichols and Stone." *Id.* Because Ms. Rymer reclassified these expenses as the responsibility of Stoney's contrary to the 2001 Lease and further because Stoney's is financially responsible for septic charges only and PAR for the remaining expenditures consistent with the 2001 Lease, the Court directs the accountant for PAR determine the amount of the septic account adjustment for both Mr. Nichols and Mr. Stone.

*Mr. Johnston's Special Fiscal Agent Reports*:

Defendants have no objections to Mr. Johnston's reports. Mr. Nichols raises several issues. The Court addresses certain issues below.

First, Mr. Nichols asserts,

> Commercial Property Management and Exclusive Rental Agreement produced by Regis A. Johnston appears to be an agreement between PAR and O'Brien Realty. However, the Agreement does not state a subject property address, is signed by Jean[n]ie Cousineaux (who has no ownership interest in PAR), and is not ratified by a representative of O'Brien Realty.

Document No. 69 at 1.

At the August 29, 2011 hearing counsel for Defendants informed the Court that a representative from O'Brien Realty has ratified the agreement. Second, Mr. Nichols is correct

18

that the June 1, 2011 Commercial Property Management and Exclusive Rental Agreement between O'Brien Realty and PAR Limited Partnership does not include an address of the property. Third, it is undisputed that Jeannie Cousineaux Stone is ***not*** a partner of PAR. She nonetheless signed the June 1, 2011 Commercial Property Management and Exclusive Rental Property as an ***owner***. *See* Letter from Johnston, Esq. to Judge Connelly of 6/24/11, Ex. 1. This is an error. The Court directs O'Brien Realty, specifically Michael O'Brien, to re-execute the June 1, 2011 Commercial Property Management and Exclusive Rental Agreement by (a) including an address for the property and (b) obtaining the signature of Mr. Stone as an owner.

Second, Mr. Nichols claims "3939 Oyster House Road is being operated as a Commercial establishment; therefore, a residential lease is not appropriate." Document No. 69 at 2. During the bench trial Jeannie Stone was shown several photographs including Defendants' Trial Exhibits 7m through 7p. Jeannie Stone described these photographs as depicting the larger house, now being used as a bed and breakfast. The four photographs displayed the front, side and rear views of the bed and breakfast. The other house is divided into two residential rentals.

In his June 24, 2011 letter to the Court Mr. Johnston enclosed five documents including "The Residential Lease for Apts 1 & 2 at 3935 Oyster House Road" and "The Residential Lease for the house at 3939 Oyste[r] House Road." Letter from Johnston, Esq. to Judge Connelly of 6/24/11, Exs. 2–3. In 2009 the house at 3939 Oyster House Road was being operated as a bed and breakfast. The Court lacks information whether the property continues to be utilized as a bed and breakfast or is strictly a residential rental property. The Court located the website for Stoney's at Broomes Island. The website indicates that *Broomes Island Inn* "is available for rent by the night and has two kitchens, four bedrooms, two laundry rooms, and generous living

space."[8]  If the property at 3939 Oyster House Road is, in fact, a bed and breakfast, the Court directs O'Brien Realty to execute a commercial lease.

Third, Mr. Nichols contends the "[d]raft lease provided to me for review and comment listed the Restaurant rental of One Hundred Eight Thousand Dollars ($108,000).  See Exhibit 'A.'  The Lease in the final report states, Seventy-Two Thousand Dollars ($72,000).  See Exhibit 'B[.]'"  Document No. 69 at 2.  This difference in amount was explained by counsel for Defendants at the August 29, 2011 hearing.  When the lease was originally drafted, the monthly rental income was approximately $9,000.  That figure included rental income from Stoney's restaurant *as well as* rental income from the two houses at Broomes Island.  However, subsequently, the two "residential" properties were segregated from Stoney's restaurant.  The "residential" properties now have their own independent leases.  The rents on the two "residential" properties are $2,000 per month and $1,500 per month respectively.  A decision was made to have the Tenant for the two "residential" properties be a separate entity, *The Money Pit, LLC*.  Under this structure, PAR and Mr. Nichols (as a limited partner of PAR) have a guaranteed annual rent.  PAR Limited Partnership, as the owner, has retained O'Brien Realty to manage the two "residential" properties.  The annual rent from Stoney's totals $72,000.00 and the annual rents for the two "residential" properties are $18,000.00 and $24,000.00 respectively, for a total annual rent of $114,000.00.

Fourth, Mr. Nichols contends there is "[n]o justification granting Phil Stone the free use of the remaining eight (8) boat slips.  Boat slips are fully occupied during the boating season, indicating a definite strong market for rental.  The PAR Ltd. Partnership should realize the income."  Document No. 69 at 2.  The Court has reviewed the June 1, 2011 Commercial Lease Agreement between PAR Limited Partnership and Stoney's Seafood House, Inc., particularly

---

[8] *Broomes Island*, http://www.stoneysseafoodhouse.com/broomes_island.php (last visited Sept. 8, 2011).

Exhibit B.  *See* Letter from Johnston, Esq. to Judge Connelly of 6/24/11, Ex. 4.  Those eight (8) boat slips are listed as part of the property under lease to Stoney's.  In a footnote *supra* the Court noted this issue has not been resolved, namely, whether *all slips* are PAR property entitling PAR to the rental income <u>or</u> whether *eight* of the slips are assigned to Stoney's.  The parties will need to come to some resolution on this matter.

Fifth, Mr. Nichols asks the Court to direct that the Agreement between PAR and Stoney's be a "triple net lease."  If the Court declines to so direct, then the Court should "order Mr. Philip Stone be removed from management of the PAR Ltd. Partnership assets, and appoint O'Brien Real Estate or another mutually agreed to third party with no bias or agenda who would consistently act in the best interest of the Partnership."  Document No. 69 at 4.  Mr. Johnston, the special fiscal agent, reviewed the Lease Agreements, suggested some changes, which were made, and is satisfied that the agreements are "proper commercially acceptable agreements."  Letter from Johnston, Esq. to Judge Connelly of 6/8/11.  The Court declines to mandate a triple net lease.  The Court further declines to remove Mr. Stone from management of PAR Limited Partnership.  With the Commercial Property Management and Exclusive Rental Agreement between PAR Limited Partnership and O'Brien Realty-Michael O'Brien and further with the creation of a separate entity, *The Money Pit, LLC*, for the two "residential" properties which O'Brien Realty will manage, procedures have been established to keep the functions of Stoney's separate and apart from the management of other PAR property.  Mr. Stone is no longer handling the day-to-day operations of both Stoney's and PAR, whose interests do not necessarily coincide.  A separate bank account has been established for PAR, as verified by Mr. Johnston.  Finally, Mr. Johnston has verified a procedure exists to ensure no commingling of funds.[9]

---

[9]  "There was a concern on my part that there should be a separate agreement not to com[m]ingle funds.  After my conversation with counsel and review of the final Property Management Agreement, I believe this is satisfied with

Sixth, Mr. Nichols asks the Court to "[r]equire Ms. Mary Stone to relinquish her role as PAR Ltd. Partnership Accountant and designate Ms. Martha Rymer, CPA, her successor[.]" Document No. 69 at 4.  The lack of trust between PAR the partners —Mr. Nichols and Mr. Stone — is all too apparent.  The retention of Mary Stone of Mullen, Sondberg, Wimbish & Stone, P.A., Mr. Stone's sister-in-law, as PAR's accountant, enhances Mr. Nichols' anxiety about any alleged undermining of his interest in PAR because he presumes Mary Stone, as the accountant, is bias in favor of Mr. Stone.  The Court finds no basis for such an assumption.  Nevertheless at this stage the Court agrees it is prudent for Mary Stone to discontinue as the CPA for PAR and for another accountant to be selected.  Rather than the Court selecting the accountant, the Court finds this responsibility should be exercised by the Property Manager, O'Brien Realty.

Finally, one other outstanding matter is the lack of a manager for the marina.  The Court encourages the parties and O'Brien Realty to identify and retain a marina manager as soon as possible.  The Court presumes the management of the marina would include the slips not presently assigned to Stoney's.  It is the Court's understanding, based on its reading of the 2001 Lease, that the rental income from these slips shall be paid to the Landlord, *i.e.*, PAR.  In the interim, since Mr. Nichols does not appear incline to personally manage any PAR property, the Court suggests Jeannie Cousineaux Stone act as interim manager of the marina.

An Order will be entered separately.


September 15, 2011                              /s/
                                    _____
                                       WILLIAM CONNELLY
                                       UNITED STATES MAGISTRATE JUDGE

_____

the requirement of the manager who will see that com[m]ingling of funds does not occur."  Letter from Johnston, Esq. to Judge Connelly of 6/8/11 at 1.